## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WAY SYSTEMS, INC.,       ) | |
|                         ) | |
|      Plaintiff,      ) | |
|                         ) | |
| v.                    ) | Civil Action No.: 04-12498-JLT |
|                         ) | |
| FRACTAL COMMERCE, INC.,  ) | |
|                         ) | |
|      Defendant.     ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR LEAVE TO MAKE DEPOSITS IN COURT

### Introduction

WAY brought this action for declaratory judgment seeking the Court's determination that it is the rightful inventor and owner of the technologies identified in seven United States patent applications filed by WAY in response to groundless allegations made by the defendant Fractal Commerce, Inc. ("Fractal") that Fractal is the inventor and owner of these technologies. In addition, Fractal claims, without basis, that WAY has materially breached the terms of the License Agreement between the parties (the "License Agreement") which gives WAY the exclusive and continued rights to use certain technology owned by Fractal and, therefore, according to Fractal, the License Agreement is terminated. A copy of the License Agreement is attached hereto as Exhibit A. As a result, WAY also brought this action to seek the Court's determination that it has not materially breached the terms of the License Agreement and that the License Agreement remains in full force and effect. In connection with Fractal's allegations, it has engaged in oppressive and coercive conduct, repeatedly

threatening to put WAY out of business unless WAY agrees to execute a highly detrimental amendment to the existing License Agreement.

Under the terms of the License Agreement WAY must make Royalty Payments[1] to Fractal in the amount of $160,000 by year end in order to maintain its exclusive right for the use of the technology it has licensed from Fractal. Additional Royalty Payments will be required next year as well as other fees referred to in the License Agreement as Terminal Fees[2].

Fractal's unfounded assertion that the License Agreement is terminated creates a "catch-22" for WAY. If WAY does not make the Royalty Payments, it risks losing the right to the exclusive use of Fractal's technology – which would be a devastating setback for WAY. Further, the failure to make future Royalty and Terminal fee payments would not only jeopardize WAY's exclusive right to Fractal's technology, but could arguably constitute a breach of the License Agreement, the precise result that WAY has fought so hard to avoid. However, in light of Fractal's position that the License Agreement is terminated, a position with which WAY strongly disagrees, it makes no sense to make these payments to Fractal - nor for Fractal to accept them. Faced with this dilemma, WAY now turns to the Court and requests leave under Fed. R. Civ. P. 67 to make deposits in Court for the Royalty Payments that will become due on or before December 31, and other Royalty and Terminal Fees that will become due next year under the License Agreement, until such time as this action is resolved.

---

[1] The License Agreement requires that WAY pay a certain dollar amount to Fractal for each unit, called MPOS Devices (defined under the License Agreement) that WAY sells. If, as is the case in 2004 WAY has not met certain Global Performance Criteria regarding the number of units sold, it can make payments in lieu of Royalty Payments in order to maintain its exclusive right to use Fractal's technology. Both types of payments are both referred to in this Motion as "Royalty Payments".

[2] Terminal fees are fee payments received by WAY for the use of the MPOS Devices which it sells. Pursuant to section 3.5 of the License Agreement, 10% of the terminal fees received by WAY for use of its MPOS devices are to be paid to Fractal.

Fractal's position that WAY has materially breached the License Agreement and that the License Agreement is terminated will not be prejudiced in any way by the granting of this motion..

## Argument

Under Fed. R. Civ. P. 67, the Court may grant leave for a party to deposit funds into Court where at least part of the relief sought in the action involves the disposition of the funds, as follows:

> In any action in which any part of the relief sought is a judgment for . . . the disposition of a sum of money . . . , a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum . . . , whether or not that party claims all or any part of the sum . . . .

The intent of Rule 67 is to make a place of safekeeping available for disputed funds and "to relieve the depositor of the responsibility for the funds in dispute while the parties hash out their differences with respect to it." *Cajun Elec. Power Cooperative, Inc. v. Riley Stoker Corp.*, 901 F.2d 441, 444-45 (5th Cir. 1990); *Gulf States Utils. Co. v. Alabama Power Co.*, 824 F.2d 1465, 1474 (5th Cir. 1987); *Prudential Ins. Co. of America v. BMC Industries, Inc.*, 630 F. Supp 1298, 1300 (S.D.N.Y. 1986).

In this case, the Court's determination of whether the License Agreement is in full force and effect or is terminated will necessarily involve the disposition of the Royalty Payments that WAY must pay to Fractal by year's end (within only two weeks) and future payments that will become due while this civil action is ongoing. WAY must either make these substantial payments to Fractal, who refuses to acknowledge WAY's rights to make the payments and to continue under the License Agreement, or it must keep the payments and risk

losing its rights under the License Agreement due to non-payment. This is precisely the type of dilemma that Rule 67 was designed to cure.

WAY's predicament is essentially the same as that faced by the defendant in *Cajun Elec. Power Coop., Inc.*, 901 F.2d at 444-45. In *Cajun Elec.*, the district court granted the defendant's motion to make payment into court under Rule 67 where the defendant wanted to pay an arbitration award to the plaintiff, but the plaintiff would not recognize the award and threatened to file a challenge to it. *Id.* at 445. The defendant was forced to "choose whether to transfer a huge sum of money to [the plaintiff] in satisfaction of an arbitration award that [the plaintiff] refused to recognize, or to suffer significant interest penalties pending a final resolution of [the plaintiff's] challenge to the award." *Id.* On appeal, the Fifth Circuit Court of Appeals affirmed the district court's decision, noting that the decision equitably resolved what otherwise would have been a "patently unfair" dilemma for the party seeking to make payment. *Id.*

This case is also comparable to *Py Small Boats, Inc. v. International Marine Marketing Corp.*, 1990 U.S. Dist. LEXIS 3906, *4-5 (D.R.I. 1990). In that case, the plaintiff filed an action for trademark infringement. *Id.* at *4. The defendant claimed a right to use the trademark under a license agreement and made royalty payments to the plaintiff. The plaintiff then moved to deposit the royalty payments into court under Rule 67. *Id.* The magistrate judge concluded that the circumstances properly called for relief under Rule 67 and recommended that the district court grant the motion. *Id.* at *5.

In contrast, courts have denied Rule 67 motions under circumstances entirely distinguishable from this case. For example, courts have denied Rule 67 motions where the moving party seeks leave to make payments into court to preserve rights under a contract while

taking the *contrary* position in the litigation that the contract is unenforceable.  *See*, *e.g.*, *Dinkins v. General Aniline & Film Corp.*, 214 F. Supp. 281, 283 (S.D.N.Y. 1963).  Rule 67 motions have also been denied where the moving party seeks to deposit *undisputed* payments in court in attempt to set-off potential damages awards against opposing parties.  *See*, *e.g.*, *219 North Broad Street Partners v. Security Pacific Credit Corp.*, 1990 U.S. Dist. LEXIS 16216, *5-6 (E.D. Pa. 1990); *Browning Ferris, Inc. v. Montgomery County*, 1990 U.S. Dist. LEXIS 11800, *3-6 (E.D. Pa. 1990).  And finally, Rule 67 motions have been denied where the motion is made as a "procedural device" to alter the legal rights and duties of the parties.  *See*, *e.g.*, *The Prudential Ins. Co. of Am. v. BMC Ind., Inc.*, 630 F. Supp. 1298, 1299-1300 (S.D.N.Y. 1986) (denying Rule 67 motion where plaintiff sought to deposit payments into court pending the resolution of defendant's claim that plaintiff had ratified the parties' agreement by accepting payments).  These cases are distinguishable from, and stand in stark contrast to, the case at bar.

The dilemma faced by WAY would be properly and fairly resolved by allowing payments into court under Rule 67.  It would relieve WAY's risk of losing rights that WAY contends it still owns under the License Agreement and would cause no prejudice whatsoever to Fractal in its contention that the License Agreement is terminated.

### Conclusion

For the foregoing reasons, WAY's Emergency Motion for Leave to Make Deposits into Court should be granted.

WAY SYSTEMS, INC.
By its attorneys

Joseph S. Ayoub, Jr., Esq. (BBO #024900)
Thomas W. Aylesworth, Esq. (BBO#630904)
Alexa H. O'Keefe (BBO #657551)
Nutter McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210-2604
(617) 439-2000

Date: December 17, 2004

## CERTIFICATE OF SERVICE

I, Joseph S. Ayoub, Jr., hereby certify that on December 17, 2004, I caused a copy of the foregoing  document to be delivered by overnight mail to defendant Fractal Commerce, Inc. [counsel for defendant has not yet appeared in this action].

Joseph S. Ayoub, Jr.

1387177.2

- 6 -

# LICENSE AGREEMENT

between

## FRACTAL COMMERCE INC.

and

## WAY SYSTEMS INC.

## LICENSE AGREEMENT

This License Agreement (hereinafter, the "Agreement") is made on October 24, 2003, by and between

(1)     Fractal Commerce Inc., a Delaware corporation having offices at 1931 Crescent Park Drive, Reston, Virginia 20190, U.S.A. ("Fractal"), and

(2)     Way Systems Inc., a Delaware corporation having offices at 200 Unicorn Park, , Woburn, Massachusetts 01801, U.S.A. ("Way")

(hereinafter, each of Fractal and Way a "Party" and, collectively, the "Parties").

### WITNESSETH:

WHEREAS Fractal has rights to intellectual property under patents and patents pending in Australia, China, Israel, Japan, the countries of the European Union and the Republic of South Africa and in certain other countries as set out in Attachment A (hereinafter, "the Licensor's Patents");

WHEREAS Fractal is in the business of commercializing and licensing certain technology in the areas of mobile commerce and electronic payment systems claimed by the Licensor's Patents (as defined below, the "V-SIM Core Technology");

WHEREAS Fractal and Way previously entered into a Prior License Agreement that granted to Way non-exclusive rights to develop applications and a back-end platform based on the V-SIM Core Technology and to manufacture and market devices using the V-SIM Core Technology;

WHEREAS Fractal and Way have agreed to modify the terms relating to duration and consideration and enter into this Agreement, which shall supersede the provisions contained in the Prior License Agreement; and

WHEREAS Way has agreed to grant to Fractal rights to use certain applications software and back-end server systems owned and developed by Way subject to the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the above stated premises and the mutual covenants and agreements set forth below, and intending to be legally bound by the provisions of this Agreement, the Parties hereby agree as follows:

### ARTICLE 1. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings indicated:

1.1     "Accounting Period" shall mean a period commencing on the first day of January and concluding on the last day of December for any given year.   The first Accounting Period shall commence on the Execution Date and conclude on the last day of December 2003.   The final

Accounting Period shall commence on the first day of January immediately preceding the date of expiration or termination and shall conclude on the date of expiration or termination.

1.2    "Agreement" shall mean this License Agreement, including any exhibits, schedules, appendices and attachments hereto, as such as may be amended from time to time, in writing, by mutual agreement of the Parties.

1.3    "Affiliate" shall mean any business entity which directly or indirectly controls, is controlled by, or is under common control with either Party to this Agreement, or which is a related corporate entity that a Party has designated in writing as an Affiliate. A business entity shall be deemed to "control" another business entity if (i) it owns, directly or indirectly, at least fifty (50) percent of the issued and outstanding voting securities, capital stock, or other comparable equity or ownership interest of such business entity; or (ii) it has the de facto ability to control or direct the management of such business entity. If the laws of the jurisdiction in which such entity operates prohibit ownership by a Party of fifty (50) percent or more, "control" shall be deemed to exist at the maximum level of ownership allowed by such jurisdiction, provided, however, that there is a de facto ability to direct or control its management.

1.4    "Auditors" shall mean a firm of independent auditors practicing in the appropriate geographic areas agreed upon in writing by the Parties.

1.5    "Aussie L.L.C." shall mean Aussie L.L.C. Pty. Ltd. of Level 1, 190 Flinders Street, Adelaide, South Australia 5000.

1.6    "Business Day" shall mean Monday, Tuesday, Wednesday, Thursday, or Friday of any week other than such day which constitutes an official United States federal government holiday.

1.7    "Commencement Date" shall mean February 20, 2002.

1.8    "Commercially Reasonable Efforts" shall mean that degree of skill, effort, expertise, and resources which a person of ordinary skill, ability, and experience, under similar circumstances, in the matters addressed herein would reasonably utilize and otherwise apply with respect to fulfilling the obligations assumed hereunder.

1.9    "Dollars" shall mean United States dollars.

1.10    "Execution Date" shall mean the date upon which this Agreement is signed and executed by the Parties.

1.11    "Firmware" shall mean the software developed by Fractal that is designed to operate on hardware using the V-SIM Core Technology, including all modifications and enhancements thereof, regardless of whether they are made by Way or any other party, including all software incorporated in the V-SIM Core Technology architecture as set forth in Attachment D.

1.12    "Foreign Currency Fees" shall mean Terminal Fees which are received or invoiced by the Licensee or its Affiliates in a currency other than Dollars.



1.13   "Global Performance Criteria" shall mean the criteria for maintaining exclusivity in the Territory under this Agreement as set forth in Section 2.1(c) and Attachment E.

1.14   "Information" shall mean any and all information, knowledge, technology, ideas, technical data, concepts, techniques, processes, formulae, expertise, models, drafts and diagrams, drawings, computer programs, source codes, object codes, user manuals, programming manuals, modification manuals, flow charts, software listings, trade secrets, inventions, discoveries, designs, methods, know-how, and any other scientific, computing, technical or manufacturing information and data whether recorded or not.

1.15   "Licensee" shall mean Way, as well as its successors, subsidiaries, divisions, permitted assigns, Affiliates, and sublicensees to the extent they have rights under this Agreement.

1.16   "Licensee Back-End Server Software" shall mean Licensee's proprietary server platform software, including all components required for the proper and efficient operation of a complete system, including but not limited to, application development tools and API specifications.

1.17   "Licensee's Confidential Information" shall mean any documentation or information which is held by the Licensee as confidential to it, including information relating to technology, processes, products, specifications, inventions or designs used or developed by the Licensee, trade secrets and know-how and information of a commercially sensitive nature, or supplied to the Licensor relating to the Licensee's Intellectual Property Rights, whether or not marked or identified as confidential, which has not come into the public domain by the fault of Licensor; but excluding any documentation or information that (i) is or becomes publicly known through no wrongful act of the Licensor, (ii) is hereafter disclosed to Licensor by a Third Party who is not, to the knowledge of Licensor, in default of any confidentiality obligation to Licensee, (iii) is furnished to a Third Party by Licensee without a similar restriction of the Third Party's rights, or (iv) independently developed by Licensor.

1.18   "Licensee's Improvements" shall mean any and all improvements and enhancements to the Licensor's Technology as applied in MPOS Devices and developed by Licensee; provided, however, any improvements to the V-SIM Core Technology developed by Licensee shall be only be owned by Licensee if such improvements are subject to granted patent under U.S. patent law, or the patent laws of another jurisdiction that includes an examination of the prior art in the patent application process.   The Licensee Improvements shall not include any V-SIM Improvements, which shall be the property of the Licensor.

1.19   "Licensee's Intellectual Property Rights" shall mean rights with respect to or in connection with copyright (including future copyright and rights in the nature of or analogous to copyright), know-how, trade mark, service mark, design, inventions (including patents), semi-conductor or circuit layout rights, trade, business or company names, or other proprietary rights (or any rights to registration of such rights, including all renewals and extensions) which are created by the Licensee (including, without limitation, front-end server technology, back-end applications and the Licensee's Back-End Server Software) and any Licensee's Improvements, whether created before, on, or after the Execution Date; but shall exclude the Licensor's Technology, the Licensor's Intellectual Property Rights, the Licensor's Know-How, the

Licensor's Technical Information, the Licensor's Confidential Information, and the Licensor's Patents..

1.20    "Licensor" shall mean Fractal, as well as its successors, subsidiaries, divisions, permitted assigns, Affiliates, and sublicensees to the extent they have rights under this Agreement, including any nominee to whom the Licensor specifies that payments owed by the Licensee shall be made.

1.21    "Licensor's Confidential Information" shall mean any documentation or information in any form whatsoever comprising or relating to technology, processes, products, specifications, inventions or designs used or developed by the Licensor or supplied to the Licensee relating to the Licensor's Technology, or other information which is held by the Licensor as confidential to it, whether or not marked or identified as confidential, which has not been come into the public domain by fault of the Licensee, including all of the Licensor's Technical Information provided by the Licensor to the Licensee subsequent to the Commencement Date; but excluding any documentation or information that (i) is or become publicly known through no wrongful act of the Licensee, (ii) is hereafter disclosed to Licensee by a Third Party who is not, to the knowledge of Licensee, in default of any confidentiality obligation to Licensor, (iii) is furnished to a Third Party by Licensor without a similar restriction of the Third Party's rights, or (iv) independently developed by Licensee.

1.22    "Licensor's Initial Pro-Rata Portion" shall mean the Licensor's percentage ownership of Licensee's securities on the Execution Date, taking into account the warrants for 500,000 shares of the Licensee's Series A-1 Preferred Stock are issued to the Licensor pursuant to Section 3.1(a) of this Agreement, with such pro rata portion to be determined on a fully-diluted basis.

1.23    "Licensor's Intellectual Property Rights" shall mean rights with respect to or in connection with copyright (including future copyright and rights in the nature of or analogous to copyright), know-how (including Licensor's Know-How), trade mark, service mark, design, inventions (including patents), semi-conductor or circuit layout rights, the Licensor's Patents, trade, business or company names, or other proprietary rights (or any rights to registration of such rights, including all renewals and extensions), whether created before, on, or after the Execution Date, which are associated with the Licensor's Technology.

1.24    "Licensor's Know-How" shall mean all inventions, discoveries, trade secrets, information, software, experience, data, formulas, procedures, Licensor Technical Information and results that have been or will be transferred from the Licensor to the Licensee.

1.25    "Licensor's Patents" shall mean the patents and applications for patents filed before and during the Term of this Agreement for the V-SIM Core Technology as specified in Attachment A of this Agreement (as may be amended from time to time), consistent with the Prior License Agreement, including (without limitation) foreign equivalents, divisions, continuations, continuations-in-part, reissues, reexaminations, or extensions of any such patent or patent application whether currently in existence or filed in the future.

1.26    "Licensor's Technical Information" shall mean any information provided or previously provided by the Licensor to the Licensee which is not in the public domain, and which is of the



type of information set out in <u>Attachment D</u> to this Agreement, which Attachment may be amended by the Licensor from time to time as new technical information, if any, is delivered to the Licensee.

1.27   "Licensor's Technology" shall mean the V-SIM Core Technology, Licensor Patents, Licensor Know-how, Licensor Technical Information and Licensor Intellectual Property Rights.

1.28   "Merchant" shall mean any business or company that accepts payments by credit, debit or any other type of payment cards through financial institutions that process transactions and completes financial settlements for such business or company through or with a deposit-taking institution, including but not limited to a bank or credit union.

1.29   "MPOS Device" shall mean any point-of-sale device which (i) incorporates the V-SIM Core Technology, in any formulation, or (ii) falls within the scope of the claims of any of the Licensor's Patents, or (iii) uses or incorporates the Licensor's Intellectual Property Rights, the Licensor's Technical Information, the Licensor's Confidential Information, or the Licensor's Know-How, and which is marketed solely to Merchants to process payment transactions with their customers, whether such customers are individuals or other Merchants.

1.30   "MPOS Market" shall mean any current or potential market for the distribution of MPOS Devices.

1.31   "Notice" shall have the meaning set forth in Section 9.1

1.32   "OEM Component" shall mean any equipment or component manufactured by the Licensee or its contractors. OEM Components shall not include Licensee's Back-End Server Software or any of Licensee's other server hardware or "server" technology.

1.33   "Performance Criteria" shall mean the minimum total unit sales required to be achieved by Licensee to maintain the exclusive license granted under this Agreement, including by prepaying royalties applicable to such units.

1.34   "Person" shall mean any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust or any other business entity.

1.35   "PPOS Device" shall mean any device incorporating the V-SIM Core Technology which is not an MPOS Device.

1.36   "PPOS Market" shall mean any current or potential market for PPOS Devices.

1.37   "Prior License Agreement" shall mean the previous agreement between the Parties, dated on or about February 20, 2002, pursuant to which Way was granted non-exclusive rights to distribute products using the V-SIM Core Technology.

1.38   "Regions" shall have the meaning set out in "Territory" below.

1.39 "Regional Performance Criteria" shall mean the minimum number of unit sales required to maintain exclusivity in a Region during the applicable Accounting Period as set forth in Section 2.1(d) and Attachment E.

1.40 "Royalties" shall mean the royalties to be paid to the Licensor by the Licensee on any MPOS Device sold subject to license under this Agreement.

1.41 "Sale", "Sold", or "Sell" shall mean the sale, transfer, or disposition of a MPOS Device for commercial purposes for value to a Third Party whether by the Licensee or its Affiliates.

1.42 "Term" shall mean the period of time as set forth in Article 8.

1.43 "Terminal Fees" shall mean (a) all fees collected from customers or resellers and received by the Licensee, either directly or indirectly, relating to the licensing of and transactions processed through MPOS Devices, regardless of whether such fees are charged at the time of original sale or license, on a subscription or monthly basis, as per-payment transaction fees, as mobile connection fees, as per-batch transaction fees, as fees charged for an unlimited number of transactions during a given period of time, or any other similar fee, less (b) all amounts payable by Licensee to any Third Party to process the transaction or to provide the service that gave rise to such fees described in preceding clause (a). Terminal Fees shall exclude (i) any fees Licensee receives from the sale and end-user licensing of MPOS Devices, provided such sale and license is not above Licensee's list price for such MPOS Devices; (ii) any fees received by the Licensee in connection with the Licensee's server platform software and server hardware products, including without limitation, the Licensee Back-End Server Software; (iii) any support and maintenance fees; and (iv) any fees related to the generation of billing statements.

1.44 "Territory" shall mean every country in the world, excluding the USA (subject to Section 2.1(e)). The Territory shall be divided into five (5) regions (each a "Region") as follows: (1) Asia and the Pacific; (2) Latin America; (3) Central and Eastern Europe, the Middle East, and Africa ("CEEMEA"); (4) North America (excluding the USA, subject to Section 2.1(e)); and (5) Europe and the United Kingdom (excluding those countries included in CEEMEA).

1.45 "Third Party" shall mean any Person (including any Person who holds shares in the Licensor or the Licensee), excluding the Licensor and the Licensee.

1.46 "USA" shall mean the United States of America.

1.47 "V-SIM Core Technology" shall mean the invention described by the Licensor's Patents that attaches to a mobile phone via the subscriber identification module (hereinafter "SIM") slot, enabling such device, the mobile phone, the SIM card, and other smart cards attached to such device to send and receive commands to and from each other.

1.48 "V-SIM Improvements" shall mean all improvements by Licensee to the hardware versions of the V-SIM Core Technology and the Firmware originally provided to the Licensee under the Prior License Agreement.



1.49    "Way Payment Schedule" shall mean the schedule set forth in Sections 3.4 and 3.5 of this Agreement, setting forth the Royalty and Terminal Fee, respectively, to be paid by the Licensee to the Licensor in partial consideration for the rights granted pursuant to this Agreement.

1.50    Any reference to a country shall include any new name for the same country, or separate countries formed out of any such country during the Term of this Agreement, and all offshore dependencies and territories of such countries.

1.51    Any reference to a statute or subordinate legislation shall extend to any amendment, replacement, re-enactment or consolidation of the statute or subordinate legislation referred to.

### ARTICLE 2. PATENTS, KNOW-HOW, IMPROVEMENTS, AND SPECIFICATIONS

2.1    <u>Grant of Rights by Licensor</u>.  Licensor hereby grants certain licensed rights with respect to the Licensor's Technology, as follows:

  (a) the Licensor hereby grants to the Licensee, and, if applicable, shall cause its Affiliates to grant to the Licensee, the exclusive license and right (to the exclusion of any Third Party, except as disclosed to the Licensee pursuant to Section 2.6(d) below) to practice the Licensor's Technology and exploit the invention the subject of the Licensor's Patents, solely to manufacture, have manufactured, produce, have produced, develop, have developed, improve, have improved, modify, have modified, use, have used, market, have marketed, sell, have sold, import, have imported, export, have exported, distribute, and have distributed MPOS Devices for the MPOS Market and solely in the Territory during the Term of this Agreement.  Other than rights expressly granted with respect to MPOS Devices as set out above, Licensee shall have no other exclusive rights hereunder.

  (b) Subject to all other provisions of this Article 2, the Licensee shall have control over the design, development, modification, improvement, and marketing of MPOS Devices using the Licensor's Technology; provided, however, that any MPOS Devices incorporating the V-SIM Core Technology must meet the minimum specifications set forth below in Section 2.7; and provided further that the Licensor shall have the right to manufacture, have manufactured, produce, have produced, develop, have developed, improve, have improved, modify, have modified, use, have used, market, have marketed, sell, have sold, import, have imported, export, have exported, distribute, and have distributed devices that may include any V-SIM Improvements.

  (c) Should the Licensee fail to meet the Global Performance Criteria as set forth in <u>Attachment E</u>, the Licensee's right of exclusivity in the Territory shall expire and, subject to all other obligations, terms, and conditions contained in this Agreement, the Licensor shall thereby grant to the Licensee a non-exclusive license and right to practice the Licensor's Technology, exploit the invention the subject of the Licensor's Patents, and to use the Licensor's Technical Information, the Licensor's Confidential Information, and the Licensor's Know-How to manufacture, have manufactured, produce, have produced, use, have used, market, have marketed, sell, have sold, import, have imported, export, have exported, distribute, and have distributed MPOS Devices subject to all payment requirements and other terms of this Agreement.

(d) Should the Licensee fail to meet the Regional Performance Criteria as set forth in Attachment E, the Licensee's right of exclusivity in such Region shall expire and, subject to all other obligations, terms, and conditions contained in this Agreement, the Licensor shall thereby grant to the Licensee a non-exclusive license and right to practice the Licensor's Technology, exploit the invention the subject of the Licensor's Patents, and to use the Licensor's Technical Information, the Licensor's Confidential Information, and the Licensor's Know-How to manufacture, have manufactured, produce, have produced, use, have used, market, have marketed, sell, have sold, import, have imported, export, have exported, distribute, and have distributed MPOS Devices subject to all payment requirements and other terms of this Agreement.

(e) For purposes of this Agreement, the USA shall be excluded from the Territory until such time as the Licensor shall have final and complete rights in the U.S. with respect to the V-SIM Technology patent, upon which time the USA will be included within the Territory within the Region of North America, and the USA patent shall be listed on Attachment A hereto. Notwithstanding the foregoing, Licensor hereby waives its right to claim and hold Licensee in breach of this Agreement or any license granted hereunder should Licensee decide to manufacture, have manufactured, produce, have produced, develop, have developed, improve, have improved, modify, have modified, use, have used, market, have marketed, sell, have sold, import, have imported, export, have exported, distribute, and have distributed MPOS Devices for the MPOS Market in the USA prior to the date Licensor acquires final and complete rights in the U.S. with respect to the V-SIM Technology patent; provided, however, Licensee shall indemnify and hold Licensor harmless from any third party claims arising as a result of the Licensee's above mentioned activity in the USA arising prior to the date Licensor has taken control of the U.S. rights to the Licensor Patents.

(f) PPOS Reseller Agreement.  The Licensee is hereby granted the non-exclusive right to resell PPOS Devices provided by Licensor to Licensee solely as PPOS Devices; provided, however, shall such PPOS Devices shall be offered by the Licensor to the Licensee at prices no less favorable than the Licensor offers to any other customer purchasing like products and quantities and on like terms and conditions; provided further that in no event shall the Licensee be required to pay greater than 60% of list price for software or 70% of list price for hardware (but in no event less than the Licensor's cost of Units Sold); and provided further that the foregoing discount shall not apply to Third Party products offered for sale by the Licensor.  In connection with the foregoing license grant, the parties will enter into a mutually agreed upon reseller agreement, which will cover the other commercial terms of the reselling arrangement, including, without limitation, terms related to forecasts, ordering, delivery, payment, warranties, support and maintenance, provided, however, that in no event shall the terms of such PPOS Reseller Agreement modify or eliminate rights granted to Licensee herein.

2.2    Grant of Rights by Licensee.

(a) License to Back-End Server Technology. The Licensee hereby grants to the Licensor a non-exclusive license to unlimited copies of the Licensee's Back-end Server Software solely for the Licensor's own use on servers owned or leased by Licensor for the support

of up to 900,000 PPOS Devices and 100,000 MPOS Devices, which license shall survive indefinitely, unless terminated by Licensee due to Licensor's breach of this license granted hereby or such other material term of this Agreement and such breach is not cured within sixty (60) days. Licensor shall not have the right to sublicense, resell or otherwise transfer any copies of Licensee's Back-end Server Software to any other party. The Licensee shall provide maintenance for such technology subject to the Licensor's payment of standard maintenance and installation fees (such installation fees not to apply to the first system installation at a single site), calculated and paid yearly in arrears based on the actual number of users during the applicable maintenance period.

(b) <u>OEM Purchase Rights.</u> The Licensee hereby grants to the Licensor the right to purchase any OEM Components for the Licensor's use in the manufacture of PPOS Devices; provided, however, that in the event the Licensee does not meet the Regional or Global Performance Criteria as set forth in <u>Attachment E</u>, the Licensor shall also have the right to purchase any OEM Component for the Licensor's use in the manufacture of MPOS Devices for such Regions in which Licensee has lost exclusivity due to failure to meet the Regional or Global Performance Criteria, as the case may be. The Licensee shall, at all times, offer such OEM Components to the Licensor at a price not to exceed the amount the Licensee's contract manufacturer charges the Licensee (net of all rebates) plus thirty (30) percent of such amount. Licensee shall use Commercially Reasonable Efforts to meet the schedule for delivery set forth in each order for OEM Components; provided, however, Licensee shall have no obligation to deliver to Licensor more than that amount of Product set forth in Licensor's most recent quarterly forecast delivered to Licensee. Nothing in this Agreement shall limit the Licensor's direct access to Licensee contractors for the direct sourcing of products and services for production of PPOS Devices.

(c) <u>MPOS Reseller Agreement.</u> The Licensor is hereby granted the non-exclusive right to resell MPOS Devices in the Territory; provided, however, that such MPOS Devices shall be offered by the Licensee to the Licensor at the lesser of either (i) the price determined by the difference of (A) the most favorable prices offered by Licensee to any other customer purchasing like products and quantities and on like terms and conditions less (B) the applicable Royalty on such MPOS Devices; or (ii) the price determined by multiplying the list price for such product by 60%, in the case of software, and 70% in the case of hardware; and provided, further, that the foregoing discount shall not apply to Third Party products offered for sale by the Licensee (including, but not limited to, printers). The parties will enter into a mutually acceptable reseller agreement, which will cover the other commercial terms of the reselling arrangement, including, without limitation, terms related to forecasts, ordering, delivery, payment, warranties, support and maintenance; provided, further, that in no event shall the terms of such MPOS Reseller Agreement restrict or eliminate rights granted to Licensor herein.

(d) The Licensee shall provide to the Licensor free of charge two Demonstration Kits as described on <u>Attachment E</u>, and shall provide to the Licensor free of charge two Demonstration Kits for all other products using the V-SIM Core Technology developed by the Licensee in the future. Such Demonstration Kits shall be delivered to the Licensor within thirty (30) days following the date of receipt of written notice of the Licensor's request.



2.3    Sublicensing.   The Licensee shall not be permitted to sublicense its rights hereunder, except (i) to the Licensee's Affiliates, contract manufacturers, and other suppliers solely for the manufacture and supply of MPOS Devices and components thereof to be supplied to the Licensee under this Agreement and in connection with its obligations under the MPOS Reseller Agreement and the OEM Purchase Rights; or (ii) to distributors, channel partners, and other resellers in connection with the marketing, sale, offering for sale, distribution, support, and maintenance of the Licensee's MPOS Devices within the Territory; provided, however, that any sublicensing of rights hereunder to any of the foregoing parties shall be in compliance with the terms and conditions of the Agreement (including, but not limited to, confidentiality obligations); and provided further that in no event shall the Licensee be permitted to receive any fees or other proceeds through the sublicensing of any rights hereunder.

2.4    Ownership.   Licensee hereby expressly acknowledges that ownership of and all rights related to (i) the Licensor's Patents, (ii) the technology the subject of the Licensor's Patents (including the V-SIM Core Technology), (iii) the Licensor's Technical Information, (iv) the Licensor's Confidential Information, (v) the Licensor's Know-How, and (vi) V-SIM Improvements are and shall remain the exclusive property of the Licensor. Licensor hereby expressly acknowledges that ownership of and all rights related to (i) the Licensee's Intellectual Property Rights, (ii) Licensee's Confidential Information, and (iii) Licensee's Improvements are and shall remain the exclusive property of the Licensee. The Licensee shall own all software and copyrights thereto that are not based on any proprietary source code provided by the Licensor (excluding source code required by applicable international or industry standards).

2.5    Licensee Rights and Duties.   During the Term of this Agreement, the Licensee shall observe and perform the terms and conditions as set forth in this Agreement, and:

(a)    The Licensee shall not use the Licensor's Patents or the Licensor's Technical Information for any purpose except as specifically authorized herein.

(b)    The Licensee shall not, without the prior written consent of the Licensor, upon any sale, lease or other transfer of any manufacturing facility (including any testing facility) or part thereof, made with the use of any of the Licensor's Technical Information, make any of the Licensor's Technical Information (including, but not limited to, information relating to reassembly, installation, operation, maintenance or repair) available to the vendee, lessee or other transferee.

(c)    The Licensee shall procure and maintain at its own cost all consents and approvals (whether statutory or otherwise) which may be required to permit the lawful manufacture, sale and distribution of any MPOS Device by the Licensee in accordance with this Agreement.

(d)    The Licensee shall immediately bring any infringement of the Licensor's Patents or the Licensor's Intellectual Property Rights with respect to the technology the subject of the Licensor's Patents of which it becomes aware to the attention of the Licensor, and will, in and about the execution of its duties, take reasonable steps to safeguard the property rights and interests of the Licensor, and will provide reasonable assistance to the Licensor at the Licensor's request and at the Licensor's cost with



respect to the Licensor's defence of its rights other than by the institution of legal proceedings.

(e)     The Licensee shall pay any tax (and any related interest and penalties), howsoever designated, imposed as a result of the existence or operation of this Agreement, including any tax which the Licensee is required to withhold or deduct from payments to the Licensor, except (i) any such tax constituting an income tax imposed upon the Licensor by any governmental entity within the United States proper (the fifty (50) states and the District of Columbia), and (ii), if the relevant office of the Licensor is located in a jurisdiction outside of the United States proper, any such tax imposed on the Licensor or any of its Affiliates. In the case of (ii), the Licensee shall furnish to the Licensor any evidence required by United States taxing authorities to establish that any such tax has been paid.

(f)     The Licensee shall keep full, proper, and up-to-date books of account and records clearly demonstrating the status of each and every MPOS Device and the status and form of all Terminal Fees received by the Licensee.

(g)     The Licensee shall from time to time, and upon the reasonable request of the Licensor, supply at its own cost to the Licensor reports, returns, and any other information relating to the exercise of the Licensee's rights under this Agreement.

(h)     The Licensee shall provide the Licensor with object code copies of V-SIM Improvements for the Licensor's unlimited use without Royalty. The Licensee shall deliver into escrow the source code for any V-SIM Improvements; provided, however, that such source code shall only be released from such escrow to Licensor in the event of the termination of this Agreement in full.

(i)     In the event Licensee commences trials of a beta version of a MPOS Device or Licensee's Back-end Server Software with a customer at or below Licensee's cost of conducting such beta trial, then Licensee shall license to Licensor one (1) beta version of such MPOS Device or Licensee's Back-end Server Software for Licensor's internal use and evaluation. In the event Licensee commences customer-paid trials of a beta version of a MPOS Device or Licensee's Back-end Server Software and Licensee is paid over and above Licensee's cost of conducting such beta trial, then Licensee shall license to Licensor one (1) beta version of such MPOS Device or Licensee's Back-end Server Software for Licensor to conduct beta trials with Licensor's customers. Licensee shall have no obligation to support any beta versions of MPOS Devices or Licensee's Back-end Server Software, unless Licensee has entered into a separate written agreement with Licensor for Licensee to support a particular beta trial of an MPOS Device or Licensee's Back-end Server Software at agreed upon fees, rates and other terms and conditions included in such separate agreement. Licensor shall discontinue use of a particular beta version of any MPOS Device or Licensee's Back-end Server Software and return such beta MPOS Device or Licensee's Back-end Server Software to Licensee if (x) Licensee requests Licensor to replace such beta MPOS Device or Licensee's Back-end Server Software with another version of such MPOS Device or Licensee's Back-end Server Software,

or (y) Licensee has released a generally available version of such MPOS Device or Licensee's Back-end Server Software. Licensor shall not be permitted to resell any version or release of a MPOS Device under the rights granted under Section 2.2(c) or as elsewhere provided under this Agreement unless Licensee has declared such version or release a generally available release.

(j)    Licensee shall not develop MPOS Devices and Licensee's Back-end Server Software in a manner that would prevent the offering of the Licensor's Mondex or other similar electronic cash system over such MPOS Devices and Licensee's Back-end Server Software.

(k)    While the Licensor continues to maintain meritorious rights to claim title to the US Pending Patent titled "Communications Method and Apparatus Improvements" by court action in the USA or Australia the Licensee agrees that it will not enter into contracts or commercial arrangements with any party representing any interest in the US Pending Patent titled "Communications Method and Apparatus Improvements" or any derivative of that application without the prior written consent of the Licensor.

2.6    Licensor Rights and Duties.    During the Term of this Agreement, the Licensor shall observe and perform the terms and conditions as set forth in this Agreement, and:

(a) The Licensor shall make available to the Licensee such of the Licensor's Technical Information as may be required by the Licensee from time to time in exercising its rights hereunder.

(b) The Licensor shall protect the Licensor's Patents as set forth in Article 5.

(c) The Licensor shall refrain from commencing or bringing any action, suit, demand, claim, or other proceeding against the Licensee or any other person in connection with the proper exercise of any rights granted to the Licensee under this Agreement.

(d) The Licensor discloses that there exists a worldwide non-exclusive license to the Licensor's Technology previously granted to Keycorp Limited, an Australian company (hereinafter "Keycorp License") and that the Keycorp License is currently outstanding. The Licensor shall use commercially reasonable efforts to effect an early termination of the Keycorp License or to have such License assigned back to the Licensor, and shall use best efforts to cause the termination of the Keycorp License on its contractual termination date, but in no event shall the Licensor use nor permit any other Third Party to use the Keycorp License to compromise or otherwise diminish the Licensee's exclusive rights under this Agreement to practice the Licensor's Technology to manufacture, have manufactured, produce, have produced, develop, have developed, improve, have improved, modify, use, have modified, use, have used, market, have marketed, sell, have sold, import, have imported, export, have exported, distribute, and have distributed MPOS Devices solely for the MPOS Market and solely in the Territory during the Term of this Agreement.

2.7    Manufacturing Specifications.    Unless otherwise consented to by the Licensor, which consent may be given or withheld at the sole discretion of the Licensor, any MPOS Device incorporating the V-SIM Core Technology shall meet the following minimum specifications:

(a)    The hardware device (hereinafter the "Backpack") which attaches to a mobile telephone shall meet the following minimum hardware configuration:    (i) a microprocessor, (ii) persistent memory not less than sixty-four (64) kbit (i.e. EEPROM), (iii) RAM not less than four (4) kilobytes, (iv) ROM as provided by the microprocessor, (v) flash memory as provided by the microprocessor, (vi) a mobile phone connector, (vii) a SIM slot, (viii) a SAM slot, (ix) a smart card reader, and (x) a unique identification number that can be generated by a microchip or secure memory on board the Backpack, such as a Dallas Semiconductor 1294 microchip or other approved equivalent.

(b)    The Firmware embedded in the Backpack that performs the APDU command routing between the Backpack, the mobile phone, the SIM card, the SAM card, and the smart card (hereinafter the "V-SIM Kernel") shall meet the following minimum functionality specifications:    (i) route all APDU traffic between the mobile phone and SIM card in compliance with GSM 11.11 standard or such other standard that replaces GSM 11.11; (ii) with respect to applications residing on the Backpack's microprocessor, the V-SIM Kernel will (A) route application-generated proactive commands to the mobile phone and mobile phone-generated proactive command responses to the application in compliance with GSM 11.14 standard or such other standard that replaces GSM 11.14, and will route application-generated APDU's to the second SAM slot and the smart card reader in compliance with ISO 7816 standard or other standard that replaces ISO 7816; and (B) route APDU's generated by the second SAM slot and the smart card reader as replies back to the application; (iii) SIM card, SAM card, and smart card interfaces will support T0 protocol in accordance with the ISO 7816 standard or other standard that replaces ISO 7816; and (iv) operate on the minimum hardware configuration specified by Licensor.

(c)    If and when available in the future, the Licensee shall include in the V-SIM Kernel an exposed application programming interface (hereinafter the "V-SIM API"), which shall provide application access to the following functionality:    (i) send APDU to the mobile phone; (ii) send APDU to the SAM card or the smart card; (iii) receive APDU from the mobile phone; (iv) receive APDU from the SAM card or the smart card; (v) write data block to persistent memory; and (vi) read data block from persistent memory.

2.8    Branding and Promotion Specifications.    The Licensee shall ensure that all MPOS Devices, product packaging, product documentation, advertising, press releases, promotional materials, or other publicly released documents are branded to indicate clearly and conspicuously the use of "V-SIM Technology" and its ownership by Licensor (or such other branding as subsequently determined by Licensor at its sole discretion) through commercially reasonable branding standards and language as will be developed by the Licensor, provided such branding standards are consistent with generally accepted industry practice.    The Licensee agrees, for itself and on behalf of its Affiliates, that neither it nor any of its Affiliates shall engage in any

activities which would be considered impermissible promotion for any MPOS Device under any legal requirement in any given country within the Territory. The Licensee is granted no right to use any other identification (such as, but not limited to, trade names, trademarks, trade devices, service marks or symbols, and abbreviations, contractions or simulations thereof) owned by or used to identify Licensor or any of its Affiliates, or any of its or their products, services or organizations. The Licensee shall not, without the prior written consent of the Licensor, represent directly or indirectly that any product, service or organization of the Licensee is a product, service or organization of the Licensor or any of its Affiliates, or that any product or service of the Licensee is made in accordance with or utilizes any information of the Licensor or any of its Affiliates. The Licensor shall have the right to require, at its sole discretion, the correction or deletion of any misleading, false, or objectionable material from any MPOS Device, product packaging, product documentation, advertising, press release, promotional material, or other publicly released document.

**2.9    Technical Audit.** The Licensee shall permit the technical audit of its activities as Licensee as follows: (i) upon receipt of documentation manifesting the confidentiality obligations as set forth in Section 7.3, the Licensee shall allow a person appointed by the Licensor who is not an employee, consultant, or director of the Licensor and who is acceptable to the Licensee (hereinafter "the Auditor") at reasonable times both to inspect any product manufactured by or for the Licensee and any information relating to such products so as to enable the Licensor to determine whether such product is a MPOS Device, and to make copies of the same for the sole purpose of preparing the Auditor's report to the Licensor and not for direct disclosure to the Licensor except insofar as the Auditor deems necessary; (ii) the Licensee shall not withhold its consent to the Licensor's appointment of the Auditor unreasonably; and (iii) the Licensee shall use Commercially Reasonable Efforts to grant to the Licensor reasonable access to all entities employed by or contracted to the Licensee or its Affiliates in connection with any MPOS Device so as to enable the Licensor to confirm compliance with the terms of this Agreement. Prior to conducting any such technical audit, the Licensor shall procure from each Auditor a confidentiality undertaking in the form set forth in Attachment C and shall provide to the Licensee a copy thereof.

## ARTICLE 3. PAYMENTS, FUNDING CRITERIA, AND REPORTS

**3.1    Equity Consideration**

(a)    Series A-1 Preferred Stock Warrants. In partial consideration for the license rights set forth in Article 2, upon execution of this Agreement, Way shall issue to Fractal warrants for the purchase of 500,000 shares of the Licensee's Series A-1 Preferred Stock, $.001 par value per share, such warrants shall have an exercise price of 0.40 Dollars per share; provided, however, that such warrants shall include a cashless exercise provision allowing for payment of the exercise price through the surrender of shares having a fair market value at the time of exercise equal to the exercise price of the shares to be purchased by the Licensor in connection with such exercise, and shall be in the form attached hereto as Attachment B ("Series A-1 Warrant"). In the event of (i) any liquidation, merger or sale of substantially all of the assets or other event that would be deemed a liquidation event of Way as defined in the liquidation preference provisions of the Series A-1 Preferred Stock as set forth in Way's then current Certificate of Incorporation and (ii) the per share consideration received by holders of Series A-1

Preferred Stock is less than 0.80 Dollars per share (subject to equitable adjustment to reflect any stock split, combination, reorganization, recapitalization, reclassification, stock distribution, stock dividend or similar event affecting the Series A-1 Preferred Stock), then the per share exercise price of the Series A-1 Warrant will be at par value of $.001 per share.

(b)     Right to Participate in Series B Preferred Stock Financing.  Fractal shall have a right to purchase in Way's Series B Preferred Stock financing up to three times (3X) that that number of shares of Series B Preferred Stock, par value $.001 per share, which Fractal would need to purchase in order to maintain Licensor's Initial Pro-Rata Portion in Way securities upon the consummation of Way's Series B Preferred Stock financing.  The Licensee's Series B Preferred Stock shall be offered to the Licensor on the same economic terms as offered to other investors in the Licensee's Series B Preferred Stock financing and conditioned upon Fractal entering into stockholder and other agreements required to be entered into be all other investors in Way's Series B Preferred Stock financing.

3.2     Funding Criteria.  In partial consideration for the license rights set forth in Article 2, in the event that the Licensee (a) fails to raise equity or debt funding of at least seven million Dollars ($7,000,000.00) by June 30, 2004, or (b) fails to achieve an equity funding event of at least two million Dollars ($2,000,000) which is closed prior to June 30, 2004 and in which the per-share valuation is greater than or equal to eight tenths of a Dollar ($.80), then the Licensee shall issue to the Licensor additional warrants for the purchase of 250,000 shares of Way's Series A-1 Preferred Stock, such warrant to be in the form attached hereto as Attachment B.

3.3     One-time License Fee Payments.  In partial consideration for the license rights set forth in Article 2, the Licensee shall pay to the Licensor an initial, non-refundable one-time technology transfer fee of four hundred thousand Dollars ($400,000) in two (2) installments:  (i) two hundred Dollars ($200,000) shall be due on the Execution Date, and (ii) two hundred Dollars ($200,000) shall be due within seven (7) days following the closing of the Licensee's Series B Preferred Stock financing; provided, however, that such payment shall be made no later than June 30, 2004.  Failure to pay the second $200,000 installment prior to July 1, 2004, shall result in automatic termination of this Agreement, but shall not affect the Licensee's obligation to pay that amount as a debt due and owing to Licensor.

3.4     Royalty Payments.

(a)     In partial consideration for the license rights set forth in Article 2, the Licensee shall pay to the Licensor a Royalty for the sale of all MPOS Devices (hereinafter each such device referred to as a "Unit") according to the following schedule, such figures to be calculated on an annual basis from first day of each Accounting Period: ten (10) Dollars per Unit for the first 10,000 Units Sold or any portion thereof; nine (9) Dollars per Unit for Units 10,001-20,000 Sold or any portion thereof; eight (8) Dollars per Unit for Units 20,001-30,000 Sold or any portion thereof; seven (7) Dollars per Unit for Units 30,001-40,000 Sold or any portion thereof; six (6) Dollars per Unit for Units 40,001-50,000 Sold or any portion thereof; five (5) Dollars per Unit for Units 50,001-60,000 Sold or any portion thereof; and four (4) Dollars per Unit for any Units Sold over 60,000; provided, however, that the Licensee shall not be required to pay any Royalty on Sales of Units to the Licensor pursuant to the MPOS Reseller Agreement set out in

Section 2.2(c). In the event that (i) the Licensor receives notice from the patent office (or an equivalent government agency) of a country in the Territory that none of the Licensor's Patents, including reissues or substitutes thereof, will achieve registration in such country in the Territory, (ii) the Licensor abandons all applications for the Licensor's Patents in such country in the Territory, or (iii) the Licensor's Patents, including reissues or substitutes thereof, are determined to be invalid in such country in the Territory pursuant to a final and non-appealable legal or administrative proceeding, then any Royalties owed by the Licensee to the Licensor hereunder in connection with Unit Sales in such country in the Territory shall be reduced by fifty percent (50%), effective upon the occurrence of any one of the above events; provided, however, that in such event the Licensee shall not be entitled to any refund, reimbursement, or claw back of Royalties paid to the Licensor in such country in the Territory by the Licensee prior to the occurrence of such event. Notwithstanding the immediately preceding sentence, and in consideration of the licenses by Licensor of Licensor's Know How, Licensor's Technical Information, and other enabling technology under this Agreement, which are valuable to the Licensee's business throughout the Territory, Licensee shall be required to pay a Royalty to Licensor on any Sales of Units in any country not covered by any of the Licensor Patents on the Execution Date (whether within the Territory or not within the Territory), and the reduction of Royalty provided by the immediately preceding sentence shall not apply to such countries.

3.5    Payment of Terminal Fees. In partial consideration for the license rights set forth in Article 2, the Licensee shall pay to the Licensor an amount equal to ten percent (10%) of the Terminal Fees received by the Licensee.

3.6    Remittance of Royalty and Terminal Fee Payments; Interest on Over-Due Payments; Withholding.

(a)    Payments. Payments due under Sections 3.4 and 3.5 shall be due quarterly on a calendar basis, in arrears, and shall be payable from a single source in the US no later than thirty (30) days after the last Business Day of each such quarter, with respect to Units Sold and Terminal Fees received by the Licensee during the prior calendar quarter. Payments due under Section 3.5 shall be computed for each quarter with Foreign Currency Fees converted in accordance with Section 3.10. All payments made by the Licensee pursuant to this Article shall be made in immediately available funds by wire transfer to such bank and account of the Licensor as may be designated from time to time by the Licensor.

(b)    Interest. If the Licensee fails to make any payment under this Agreement to the Licensor by the due date for such payment, without prejudice to any other right or remedy available to the Licensor, the Licensor shall be entitled to charge the Licensee interest (both before and after judgment) from the due date on the amount unpaid at the lesser rate of (a) twelve percent (12%) per annum, or (b) the maximum interest rate under applicable law.

3.7    Royalty and Terminal Fee Payment Reports. Each Royalty payment made to the Licensor by the Licensee shall be accompanied by a written report, certified by an appropriate officer of the Licensee, detailing the number of Units Sold for which Royalties are owed by the Licensee to the Licensor pursuant to Section 3.4, along with a calculation of the Royalties due for the quarter for which payment is being made, such calculation to detail specifically the

number of Units Sold on a Region-by-Region basis. Each Terminal Fee payment made by the Licensee to the Licensor shall be accompanied by a written report, certified by an appropriate officer of the Licensee, detailing the total amount of Terminal Fees received by the Licensee for which the requisite percentage is owed pursuant to Section 3.5, along with a calculation of the Terminal Fee payments due for the quarter for which payment is being made, such calculation to detail specifically the types of Terminal Fees received by the Licensee on a Region-by-Region basis. No later than eight (8) weeks after the conclusion of each Accounting Period, the Licensee shall furnish to the Licensor an audited statement of the number of Units Sold and the amount of Terminal Fees received by the Licensee on a Region-by-Region basis for the relevant Accounting Period, such audited statements to be certified as correct by outside, certified independent Auditors a Big Four accounting firm.

3.8    Records. The Licensee shall, and shall cause its Affiliates to, keep and maintain for two (2) years after payment of Royalties or Terminal Fees to the Licensor pursuant to Sections 3.4 and 3.5, respectively, complete and accurate books of account and records in sufficient detail so that the total number of Units Sold (and Royalties payable hereunder) and Terminal Fees received by the Licensee (and Terminal Fee payments payable hereunder) can be properly and easily calculated. Such books of account and records shall be kept and maintained at the Licensee's usual place of business or such other place as the Licensor may authorize in writing from time to time. The Licensor shall have the right during reasonable business hours by itself or by a designated representative to inspect such books of account and records for the purpose of verifying the number of Units Sold, the Terminal Fees received by the Licensee, and the payments due to the Licensor under this Agreement; provided, however, that the Licensor may not exercise its inspection rights unless and until it procures and provides to the Licensee confidentiality undertakings in the form of Attachment C from each individual who intends to exercise such rights on the Licensor's behalf.

3.9    Audit. At any time within three (3) months after the conclusion of any Accounting Period and upon reasonable written notice to the Licensee, the Licensor may require inspection of the Licensee's books of account and records relating to the number of Units Sold and the amount of Terminal Fees received by the Licensee by an independent chartered accountant legally authorized to practice, appointed at the sole discretion of the Licensor, and named in said written notice to the Licensee. The Licensee shall thereupon permit such accountant to inspect, copy, and audit all its books of account and records relating to the number of Units Sold and the amount of Terminal Fees received by the Licensee, and shall permit such accountant to inspect, copy, and audit any invoices, vouchers, receipts, tax returns, sales slips, sales records, sales dockets, credit sales agreements, bank deposit records, cash register tapes, and other evidence as may reasonably be required by such accountant, for the sole purpose of verifying the accuracy of the payments made to the Licensor (as specified in Sections 3.4 and 3.5) and the reports submitted to the Licensor (as specified in Section 3.7). Such accountant may prepare a written report, such report to constitute prima facie evidence in the case of a dispute between the Parties. If the Licensee should fail to produce the audited statement as provided for in Section 3.7 by the due date therefore, the cost of the audit as provided for in this Section shall be payable by the Licensee to the Licensor on demand, but otherwise such cost shall be borne solely by the Licensor. If the number of Units Sold or the Terminal Fees received by the Licensee have been incorrectly stated by the Licensee, the amount of any corresponding deficiency in payment shall

be payable by the Licensee to the Licensor on demand, with interest on any deficient payment calculated according to the interest provisions of Section 3.6. The Licensor may not exercise its right of audit under this Section unless and until it procures and provides to the Licensee confidentiality undertakings in the form of <u>Attachment C</u> from each accountant whom the Licensor selects to conduct the audit.

3.10    <u>Foreign Currency Conversion</u>. Payments made under this Agreement shall be payable in Dollars. The payments due and payable under Sections 3.4 and 3.5 shall be computed for each quarter with Foreign Currency Fees converted into Dollars using the exchange rate as of the last day of the applicable calendar quarter during which the royalties and fees were generated, as reported by U.S. banking authorities.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES

4.1    <u>Fractal's Representations and Warranties</u>. Except as disclosed on the schedule of exceptions ("Schedule of Exceptions") delivered to Licensee upon execution of this Agreement and attached hereto as Attachment G, Licensor hereby represents and warrants the following to Way:

(a)    Fractal (i) is a company duly organized, validly existing, and in good standing under the laws of Delaware, with its principal place of business as indicated in the first paragraph of this Agreement; (ii) is duly qualified as a corporation and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, where the failure to be so qualified would have a material adverse effect on its financial condition or its ability to perform its obligations under this Agreement; (iii) has the requisite corporate power and authority and the legal right to conduct its business as now conducted and hereafter contemplated to be conducted, including through the acknowledgement of this License Agreement by Aussie LLC attached to this Agreement as Attachment H; (iv) has all necessary licenses, permits, consents, or approvals from or by, and has made all necessary notices to, all governmental authorities having jurisdiction, to the extent required for such ownership and operation; and (v) is in compliance with its certificate of incorporation and by-laws.

(b)    The execution, delivery, and performance of this Agreement by Fractal and all instruments and documents to be delivered by it thereunder (i) are within its corporate power; (ii) have been duly authorized by all necessary and proper corporate action; (iii) are not in contravention of any provision of its certificate of incorporation, memoranda and articles of association, or by laws; (iv) do not violate any law or regulation or any order or decree of any court of governmental instrumentality; (v) do not violate any terms of any indenture, mortgage, deed of trust, lease, agreement, or other instrument to which Fractal or any of its property is bound, which violation would have a material adverse effect on its financial condition or on its ability to perform its obligations under this Agreement, except to the extent disclosed in the Schedule of Exceptions; and (vi) do not require any filing or registration with or the consent or approval of any governmental body, agency, authority, or any other Person which has not been made or obtained previously.

(c)   This Agreement has been duly executed and delivered by Fractal and constitutes a legal, valid, and binding obligation of it, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable insolvency and other laws affecting creditors' rights generally or by the availability of equitable remedies.

(d)   To the best of its knowledge and belief, Fractal has the necessary right, title, and/or interest in and to the Licensor's Technology in order to grant the rights provided to Licensee pursuant to Article 2.

(e)   Licensor has not received any written notice of alleged infringement or misappropriation of any Third Party's intellectual property with respect to the rights granted herein nor has it received a written notice of any conflict with any other intellectual property rights of any Third Party with respect to the rights granted herein, except as disclosed in the Schedule of Exceptions.  Licensor is not aware of any infringement of the Licensor's Patents, or any misappropriation of the Licensor's Know-How by any Third Party which in Licensor's opinion would be material to Licensee's reasonable business decision to enter into this Agreement, except as disclosed to Licensee in writing prior to the execution date of this Agreement.

(f)   To the best of Licensor's knowledge and belief, there are no judicial, arbitral, regulatory, or administrative proceedings or investigations, claims, actions, or suits relating to the Licensor's Technology (other than as part of the relevant process of application for regulatory or patent approval) pending against Fractal in any court or by or before any governmental body or agency, including product liability, and to Licensor's best knowledge and belief, no such judicial, arbitral, regulatory, or administrative proceedings or investigations, actions, or suits have been threatened against Fractal.

(g)   To the best of Licensor's knowledge and belief, Licensor has not now and has not had any employees who possess contractual rights relating to the Licensor's Patents or the Licensor's Know-How.

(h)   To the best of Licensor's knowledge and belief, there exist no outstanding options, licenses, or agreements with any Third Party that would prevent the grant of rights to Licensee under this Agreement, except to the extent disclosed in Section 2.6(d).

4.2   Way's Representations and Warranties.  Way hereby represents and warrants the following to Fractal:

(a)   Way (i) is a company duly organized, validly existing, and in good standing under the laws of Delaware, with its principal place of business as indicated in the first paragraph of this Agreement; (ii) is duly qualified as a corporation and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, where the failure to be so

qualified would have a material adverse effect on its financial condition or its ability to perform its obligations under this Agreement; (iii) has the requisite corporate power and authority and the legal right to conduct its business as now conducted and hereafter contemplated to be conducted; (iv) has all necessary licenses, permits, consents, or approvals from or by, and has made all necessary notices to, all governmental authorities having jurisdiction, to the extent required for such ownership and operation; and (v) is in compliance with its certificate of incorporation and by-laws.

(b)    The execution, delivery, and performance of this Agreement by Way and all instruments and documents to be delivered by it thereunder (i) are within its corporate power; (ii) have been duly authorized by all necessary and proper corporate action; (iii) are not in contravention of any provision of its certificate of incorporation, memoranda and articles of association, or by-laws; (iv) do not violate any law or regulation or any order or decree of any court of governmental instrumentality; (v) do not violate any terms of any indenture, mortgage, deed of trust, lease, agreement, or other instrument to which Way or any of its property is bound, which violation would have a material adverse effect on its financial condition or on its ability to perform its obligations under this Agreement; and (vi) do not require any filing or registration with or the consent or approval of any governmental body, agency, authority, or any other Person which has not been made or obtained previously.

(c)    This Agreement has been duly executed and delivered by Way and constitutes a legal, valid, and binding obligation of it, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable insolvency and other laws affecting creditors' rights generally or by the availability of equitable remedies.

(d)    Way follows reasonable commercial practices common in the industry to protect its proprietary and confidential information, including requiring its employees, consultants, and agents to be bound in writing by obligations of confidentiality and non-disclosure, and requiring its employees, consultants, and agents to notify Way of and assign to it any and all inventions and discoveries discovered by such employees, consultants, and/or agents made within the scope of and during their employment.

(e)    Way agrees to use Commercially Reasonable Efforts to develop the market for MPOS Devices within the Territory taking into account, among other factors, Way's manpower and commercial resources; provided, however, that achievement of the Global Performance Criteria set forth on Attachment E shall in all circumstances be deemed to have satisfied this obligation and that the consequences for failing to meet this obligation shall be limited to conversion of the licenses granted herein from exclusive to non-exclusive pursuant to Section 2.1(c).

## ARTICLE 5. PROTECTION OF PATENT RIGHTS

5.1    Prosecution and Maintenance of the Licensor's Patent Rights.  The Licensor agrees to prosecute with reasonable diligence and maintain at its expense the Licensor's Patents. The



Licensor shall promptly give Notice to the Licensee of the grant, lapse, revocation, surrender, invalidation, or abandonment of any Licensor's Patents.

5.2    Notice.  Each Party shall provide Notice to the other of any suspected infringement of or challenge to the validity or enforceability of any of Licensor's Patents immediately upon learning of such infringement or challenge.

5.3    Infringement by Third Parties.

(a)    Protection of the Licensor's Patent Rights.  The Licensor and the Licensee agree to take the actions specified below in this Section 5.3 and 5.4, in the name of the Licensor or one of its Affiliates, to protect the Licensor's Patents licensed under this Agreement against any Third Party who either (i) infringes the Licensor's Patents ("Third Party Infringement") or (ii) brings any claims or proceedings against the Licensor or the Licensee or any of their Affiliates for infringement of such Third Party's patents in relation to the use and exploitation of the Licensor's Patents.

(b)    Action by the Licensor to Defend the Licensor's Patent Rights.  Subject to Section 5.3(c) and 5.4(b), the Licensor shall have primary discretion for defending the Licensor's Patents against any claims that the Licensor's Patents infringe the rights of a Third Party.  The Licensee may, at any time, at its cost retain separate counsel and appear separately in the proceedings to protect its interest relating to its rights under this Agreement.

(c)    In the event either Party becomes aware any Third Party Infringement that infringes the rights granted to Licensee under Article 2, such Party shall notify the other Party of such Third Party Infringement.  Licensor shall have a period of sixty (60) Business Days from the date of such notice ("Third Party Infringement Notice Period") to determine whether it will pursue an action against such Third Party Infringement.  In the event Licensor exercises its discretion to pursue an action against such Third Party Infringement, Licensor shall (i) deliver written notice to Licensee that Licensor is pursuing an action against such Third Party Infringement, (ii) use commercially reasonable efforts to prosecute an action against such Third Party Infringement, and (ii) be entitled to any damages obtained as a result of any such proceedings with respect to an infringement of the Licensor's Patents, by settlement or otherwise.  If by the end of the Third Party Infringement Notice Period,  Licensor has not elected to pursue an action against such Third Party Infringement, or if the Licensor sooner provides notice to the Licensee that the Licensor has elected not to initiate an action against such Third Party Infringement, then the Licensee shall have the primary right, but not the obligation, to prosecute an action against such Third Party Infringement at its own expense without further consent of the Licensor, but only to the extent of the infringement against the rights granted to the Licensee under Article 2, and if Licensee exercises such right, Licensee shall (i) deliver written notice to Licensor that Licensee is pursuing an action against such Third Party Infringement, (ii) use commercially reasonable efforts to prosecute an action against such Third Party Infringement, and (iii) be entitled to any damages obtained as a result of any such

proceedings with respect to an infringement of the Licensor's Patents, by settlement or otherwise. In connection with any such action by Licensee under this section, Licensor shall cooperate in assisting Licensee's efforts to establish standing to bring such action.

**5.4    Third Party Infringement Claims.**  In the event that a Third Party should bring a claim against the Licensor and/or its Affiliates and/or against the Licensee and/or its Affiliates as a result of the exercise by the Licensee of the rights granted to it under Article 2, that the manufacture or production of MPOS Devices, in accordance with and as contemplated by this Agreement, using the Licensor's Know-How or inventions and discoveries specified in the Licensor's Patents, infringes the patent rights of such Third Party, (hereinafter an "Infringement Claim"), then:

(a)    The Licensor shall have a period of sixty (60) Business Days from the date of notice of an Infringement Claim ("Claim Notice Period") to determine whether it will defend against and hold Licensee harmless from such Infringement Claim at the Licensor's sole expense.  If by the end of the Claim Notice Period, Licensor elects to defend against such Infringement Claim, Licensor shall defend, indemnify and hold harmless the Licensee, from and against any and all claims, demands, losses, liabilities, damages, charges or expenses, including, without limitation, any royalties, license fees, settlements amounts, judgments, investigative costs, court costs, reasonable attorneys' fees (collectively, the "Infringement Claim Liabilities") which Licensee may suffer, pay, or incur as a result of or in connection with such Infringement Claim.

(b)    If by the end of the Claim Notice Period, should the Licensor not elect to defend such Infringement Claim, or if the Licensor sooner provides Notice to the Licensee that the Licensor has elected not to defend such claim, then the Licensee shall assume the right, but not the obligation, to defend, settle, or otherwise resolve such Infringement Claim at its own expense without further consent of the Licensor.  Licensor agrees to reasonably cooperate with Licensee in connection with Licensee's defense against such Infringement Claim.  In the event the Licensee suffers, pays or incurs any Infringement Claim Liabilities in connection with the Licensee's defense, settlement or resolution of such Infringement Claim, then the Licensee shall be entitled to offset such Infringement Claim Liabilities against any Royalties or Terminal Fee payments owed by the Licensee to the Licensor related to product sales and revenues received by the Licensee in the specific jurisdiction of the Territory where the Infringement Claim is applicable; provided, however, that the Licensee shall not be entitled to any refund, reimbursement, or claw back of any Royalties paid by the Licensee to the Licensor prior to the date the Licensor receives Notice from the Licensee of such Infringement Claim.  In connection with any such action by Licensee under this section, Licensor shall cooperate in assisting Licensee's efforts to establish standing to defend such action.

## ARTICLE 6. INDEMNIFICATION AND LIABILITY

6.1     Indemnification. Subject to Section 5.4, the Licensee hereby expressly and forever releases and discharges the Licensor absolutely from and with respect to any liability or responsibility whatsoever which the Licensor may otherwise have to the Licensee with respect to any loss, damage, or injury incurred or suffered by the Licensee; or for which the Licensee may become liable or responsible with respect to any loss of trade or profits, loss of or damage to property, or other injury to any Third Party arising out of any incident or cause whatsoever being connected with the exercise of the Licensee's rights under this Agreement howsoever; and the Licensee hereby forever indemnifies and agrees to hold harmless the Licensor from and against any and all responsibility or liability which the Licensor may incur, suffer, or sustain as a result of, or arising in any manner out of, the purchase, distribution, sale, use, misuse, or defect in any MPOS Device, whether consisting of loss of trade or profits, loss of or damage to property, or other injury to or death of any Third Party howsoever.   Licensee shall have the right to assume the defense of any suit or claim for Licensee provides full indemnification hereunder.  The Licensor may, at any time, at its cost retain separate counsel and appear separately in the proceedings for any suit or claim for which Licensee has assumed the defense of under this Section.

6.2     Product Liability Insurance. The Licensee shall effect and maintain in force during the Term of this Agreement product liability insurance in the maximum amount per claim and an annual aggregate of claims of two million Dollars ($2,000,000.00) with respect to MPOS Devices, and shall provide evidence thereof to the Licensor's satisfaction upon request.

## ARTICLE 7. CONFIDENTIALITY AND PROTECTIVE OBLIGATIONS

7.1     Confidentiality Obligations. From the Execution Date, each Party shall keep confidential, and shall cause its respective Affiliates and their respective officers, directors, employees, and agents to keep confidential all information proprietary or confidential to the other Party that has been acquired by it through its participation in the negotiation and performance of this Agreement or the Prior License Agreement, provided that the foregoing restriction shall not apply to information that (i) is or becomes publicly known through no wrongful act of the receiving Party, (ii) is hereafter disclosed to such Party by a Third Party who is not, to the knowledge of such Party, in default of any confidentiality obligation to the other Party, (iii) is furnished to a Third Party by Licensee without a similar restriction of the Third Party's rights, (iv) is independently developed by the receiving Party, or (v) is provided by such Party under appropriate terms and conditions, including confidentiality provisions equivalent to those in this Agreement, to Third Parties for consulting, accounting, legal, and similar purposes, or to any permitted assignee of this Agreement, to the extent considered reasonably necessary to facilitate the assignment. Each Party recognizes that any violation of this confidentiality provision may cause the other Party irreparable harm and agrees that the other Party may be entitled, in addition to any other right or remedy it may have, at law or in equity, to an injunction without the posting of any bond or security, enjoining the disclosing Party, its Affiliates and their respective officers, directors, employees, and agents from any violation or potential violation of this Article.

7.2    Licensor's Confidential Information.  Subject to Section 7.1, at all times during the Term of this Agreement and after its termination, all of the Licensor's Confidential Information provided to the Licensee by the Licensor, or of which the Licensee becomes aware as a result of the exercise of any right granted to the Licensee under this Agreement, will (i) be kept strictly confidential; (ii) be safely and securely stored when not in use; (iii) remain the absolute and exclusive property of the Licensor; and (iv) not be disclosed or divulged to any Third Party in any manner whatsoever, not be used for any purpose or enterprise other than by the Licensee for purposes explicitly specified in this Agreement, and not be photographed or reproduced in any way other than for the purposes explicitly specified in this Agreement (including, but not limited to, with relation to any dispute arising under this Agreement) except with the Licensor's prior written consent.  The Licensee shall bind and compel all employees, permitted agents and assigns (if any), and suppliers of the Licensee who are required to have access to any of the Licensor's Confidential Information to comply with all of the Licensee's obligations hereunder. The Licensee shall indemnify and keep indemnified the Licensor against all loss, damage, liability, or expense arising from or in relation to any breach on the part of the Licensee, its employees, or permitted agents and assigns (if any) of any obligation contained hereunder.  The duty of confidence specified in this Section shall not extend to Licensor's Confidential Information that is required to be disclosed in compliance with legal requirements or order by a court or other governmental or regulatory agency or body having competent jurisdiction, provided that reasonable measures shall be taken to assure confidential treatment of such information.

7.3    Licensee's Confidential Information.  Subject to Section 7.1, at all times during the Term of this Agreement and after its termination, all of the Licensee's Confidential Information provided to the Licensor by the Licensee, or of which the Licensor becomes aware as a result of the exercise of any right granted to the Licensor under this Agreement, will (i) be kept strictly confidential; (ii) be safely and securely stored when not in use; (iii) remain the absolute and exclusive property of the Licensee; and (iv) not be disclosed or divulged to any Third Party in any manner whatsoever, not be used for any purpose or enterprise other than by the Licensor for purposes explicitly specified in this Agreement, and not be photographed or reproduced in any way other than for the purposes explicitly specified in this Agreement (including, but not limited to, with relation to any dispute arising under this Agreement) except with the Licensee's prior written consent.  The Licensor shall bind and compel all employees and permitted agents and assigns (if any) of the Licensor who are required to have access to any of the Licensee's Confidential Information to comply with all of the Licensor's obligations hereunder.  The Licensor shall indemnify and keep indemnified the Licensee against all loss or damage arising from or in relation to any breach on the part of the Licensor, its employees, or permitted agents and assigns (if any) of any obligation contained hereunder.  The duty of confidence specified in this Section shall not extend to Licensee's Confidential Information that is required to be disclosed in compliance with legal requirements or order by a court or other governmental or regulatory agency or body having competent jurisdiction, provided that reasonable measures shall be taken to assure confidential treatment of such information.

7.4    Technical Information.  Subject to Sections 7.1 and 7.2, certain of the Licensor's Technical Information has been furnished by the Licensor to the Licensee for limited use subject to the terms of this Agreement from the Commencement Date to the Execution Date, and certain



of the Licensor's Technical Information will continue to be furnished by the Licensor to the Licensee for limited use pursuant to this Agreement. The Licensor grants to the Licensee a personal and non-exclusive right to use Licensor's Technical Information to produce MPOS Devices in the factories of Licensee's suppliers pursuant to the license granted by this Agreement, and further grants to Licensee a personal and non-exclusive right, as an attribute of the right granted in Section 2.3, to disclose to any supplier or prospective supplier only those portions of the Licensor's Technical Information that are necessary for the Licensee's procurement of services necessary to produce MPOS Devices; provided, however, that the Licensee shall not make any portion of the Licensor's Technical Information available to any such supplier or prospective supplier except on the agreement in writing of such supplier or prospective supplier that it (i) accepts the Licensee's commitments hereunder and the confidentiality obligations specified in Sections 7.1 and 7.2 as its own, (ii) shall use the Licensor's Technical Information provided to it solely for the purpose of supplying to the Licensee MPOS Devices or any components thereof, and (iii) shall promptly destroy or return to the Licensor each and every part of the Licensor's Technical Information as directed by the Licensor at any time. The Licensee shall promptly notify the Licensor each time such an agreement with a supplier or prospective supplier is executed and copies thereof shall be furnished to Licensor promptly upon request.

## ARTICLE 8. TERM AND TERMINATION

8.1    Term. This Agreement shall be in effect from the Execution Date and shall continue for a perpetual Term (except as to the Licensor's Patents, at to which the license hereunder shall be limited to the life of such Patents in jurisdictions which so require), unless terminated pursuant to this Article.

8.2    Termination. This Agreement may be terminated under the following conditions:

(a)    Material Breach by the Licensee. This Agreement may be terminated by the Licensor, in the event the Licensee commits a material breach of this Agreement and (i) the breach is incurable, the such termination shall take effect upon delivery of Notice of termination to the Licensee, or (ii) for all other breaches and the Licensee fails to cure such breach within sixty (60) days of receiving Notice of default from the Licensor.

(b)    Material Breach by Licensor. This Agreement may be terminated by the Licensee, in the event the Licensee, in the event Licensor commits a material breach of this Agreement and (i) the breach is incurable, or (ii) the Licensor fails to cure such breach within sixty (60) days of receiving Notice of default from the Licensee.

(c)    Insolvency. This Agreement may be terminated by the Licensor, by giving Notice to the Licensee, in the event that the Licensee becomes insolvent, declares insolvency, enters into liquidation whether compulsorily or voluntarily, compounds with its creditors, has a receiver or any other external administrator appointed over all or part of its assets, takes or suffers any similar action in consequence of debt, or announces an intent to file for reorganization under the U.S. Bankruptcy Code or any other

reorganization effected for the protection of creditors.    Such termination shall take effect upon delivery of Notice of termination to the Licensee.

8.3    <u>Licensor's Rights Upon Termination</u>.  Upon any termination of the rights granted to the Licensee hereunder, the Licensee shall immediately cease all use of the Licensor's Technical Information and shall, as directed by the Licensor, promptly destroy or deliver to the Licensor each and every part specified by the Licensor of the Licensor's Technical Information then under the Licensee's control.

8.4    <u>Effect of Termination</u>.  Expiration or termination of this Agreement for any reason shall not be construed to release any Party of any obligation matured prior to the effective date of expiration or termination.  The Licensee may, for twelve (12) months after the effective date of expiration or termination, Sell all MPOS Devices it has on hand at such effective date and shall be liable for payment to the Licensor of Royalties on such Sales.  If the Licensee elects to Sell the MPOS Devices it has on hand on such effective date, the Licensee shall, subject to **Section 7,** return to the Licensee, or otherwise dispose of as the Licensor may instruct, all the Licensor's Confidential Information, Technical Information, and Know-How which the Licensee may have in its possession or control upon the earlier of (i) the Licensee's final Sale of any MPOS Device, and (ii) twelve (12) months from the date of termination of this Agreement.  If the Licensee does not elect to Sell the MPOS Devices it has on hand on such effective date, the Licensee shall, subject to Section 7, promptly return to the Licensor, or otherwise dispose of as the Licensor may instruct, all the Licensor's Confidential Information, Technical Information, and Know-How which the Licensee may have in its possession or control.

8.5    <u>Survival</u>.  All rights or obligations under Sections 2.4, Article 7, Article 8 and Article 9 shall survive the expiration or termination of this Agreement.

## ARTICLE 9. GENERAL

9.1    <u>Notice</u>.  Notices and other communications (each, a "Notice") provided herein shall be in English and in writing, and shall be delivered by hand or overnight courier service, or sent by certified or registered mail or facsimile (with receipt confirmed) as follows:

(a)    If to the Licensor, to:

Fractal Commerce Inc.
1931 Crescent Park Drive
Reston, Virginia 20190
U.S.A.
Facsimile: 703-437-7807

(b)    If to the Licensee, to:

Way Systems Inc.
200 Unicorn Park
Woburn, Massachusetts 01801
U.S.A.

All Notices and other communications given to any Party in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by facsimile (with receipt confirmed by telephone or by facsimile machine), or on the date seven (7) Business Days after dispatch by certified or registered mail (postage prepaid) if mailed, in each case delivered, sent, or mailed (properly addressed) to such Party to its address as set forth in this Section, or to such other address or facsimile number of which such Party may notify the other Party from time to time.

9.2     Registration and Filing of this Agreement.  To the extent, if any, that a Party concludes in good faith that it is required to file or register this Agreement or a notification thereof with any governmental authority, including, without limitation, the U.S. Securities and Exchange Commission, the Competition Directorate of the Commission of the European Communities, or the U.S. Federal Trade Commission, such Party shall inform the other Party thereof and both Parties shall cooperate each at its own expense in such filing or notification and shall execute all documents reasonably required in connection therewith.  In such filing or registration, the Parties shall request confidential treatment of sensitive provisions of the Agreement, to the extent permitted by law.  The Parties shall promptly inform each other as to the activities or inquiries of any such governmental authority relating to this Agreement, and shall cooperate to respond to any request for further information therefrom on a timely basis.

9.3     Relationship.  This Agreement shall not constitute any Party as the legal representative or agent of the other, nor shall any Party have the right or authority to assume, create, or incur any liability or any obligation of any kind, express or implied, against, or in the name of or on behalf of, the other Party.  This Agreement shall not constitute, create, or in any way be interpreted as a joint venture, partnership, or formal business organization of any kind.

9.4     Headings.  The headings used in this Agreement are included for convenience only and are not to be used in construing or interpreting this Agreement.

9.5     Assignment by Licensor.  This Agreement may not be assigned by the Licensor without the prior written consent of the Licensee except (i) to Affiliates of the Licensor, or (ii) upon a merger with, or the acquisition of a majority of the shares or substantially all of the Licensor's assets by a Third Party, such Third Party to be deemed the successor to all the rights and obligations of the Licensor under this Agreement and shall be subject to all of the terms thereof, including any attachment, exhibit, or schedule hereto.

9.6     Assignment by Licensee.  This Agreement may not be assigned by the Licensee without the prior written consent of the Licensor except (i) to Affiliates of the Licensee, or (ii) upon a merger with, or the acquisition of a majority of the shares or substantially all of the Licensee's assets by a Third Party, such Third Party to be deemed the successor to all the rights and obligations of the Licensee under this Agreement and shall be subject to all of the terms thereof, including any attachment, exhibit, or schedule hereto; provided, however, that no assignment shall be effective unless the Licensee's assignee first enters into an agreement with the Licensor agreeing to be bound by all terms of this Agreement and such assignee is capable of performing fully thereunder. 

**9.7    Covenant of Further Assurances.** The Parties covenant and agree that, subsequent to execution and delivery of this Agreement and without any additional consideration, each of the Parties shall execute and deliver any further legal instruments and perform such acts which are or may become necessary to effectuate the purposes of this Agreement.

**9.8    Entire Agreement.** This Agreement and all attachments, including exhibits and schedules hereto, constitute the entire agreement among the Parties with respect to the matters set forth herein, and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect thereto, including without limitation, the Term Sheet for License Agreement between Fractal Commerce, Inc. and Way Systems, Inc. entered into on or about July 25, 2003, among the Parties with respect thereto.

**9.9    Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.

**9.10    Waivers; Amendment.** The failure of either Party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right hereunder, shall not be construed as a waiver or relinquishment of the future performance of any such term, covenant, or condition or the future exercise of such right, and the obligation of the other Party with respect to such future performance shall continue in full force and effect. No item or provision of this Agreement may be altered or amended except by a writing signed by both Parties.

**9.11    Governing Law.** This Agreement shall be governed by, construed, and enforced in accordance with the laws of the Commonwealth of Virginia, other than its conflict of laws principles directing the application of any other law; provided, however, that if the subject of the dispute is default in compliance with regard to or performance in a particular place, the Party seeking to enforce such compliance or performance may bring such proceedings in a court, tribunal, or other body having jurisdiction in that place. Application of the U.N. Convention of Contracts for the International Sale of Goods is expressly excluded.

**9.12    Termination of Prior License Agreement.** As of the Execution Date, all licenses, rights, and obligations under the Prior License Agreement are terminated.

**9.13    Counterparts.** This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**9.14    Costs.** Each Party shall bear their own costs incidental to this Agreement. The Licensee shall bear all stamp duties and registration costs payable in South Australia and elsewhere with respect to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as a deed.

**WAY SYSTEMS INC.**

By:

           Name: Will Graylin
           Title:   CEO

**FRACTAL COMMERCE INC.**

By:_____

           Name: Keith Benson
           Title:   President

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as a deed.

**WAY SYSTEMS INC.**

By:_____

        Name:  Will Graylin
        Title:   CEO

**FRACTAL COMMERCE INC.**

By:_____

        Name: Keith Benson
        Title:  President

## ATTACHMENT A

### Licensor Patents

| Region | App# | Date | Title | Status | Product Family |
|--------|------|------|-------|--------|----------------|
| Argentina | P000104478 | 8/28/00 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Argentina | P000104479 | 8/28/00 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Australia | 42518/99 748139 | 06/11/99 | Communication Method & Apparatus Improvements | Granted | VSIM |
| Australia | 36353/00(Div) 726580 | 5/23/00 11/9/00 | Communication Method & Apparatus Improvements | Granted | VSIM Super |
| Australia | 20817/00 | 3/13/00 | Improvements Relating to an Attachment for a Mobile Phone | Pending | CardSwitch Super |
| Australia | 75334/96 697560 | 12/13/96 10/8/98 | Improvements Relating to Mobile Phones | Granted | CardSwitch |
| Brazil | 99U11309 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Bulgaria | 105146 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Canada | | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Chile | 24282-2000 | 12/9/2000 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Chile | 2483-2000 | 12/9/2000 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| China | 99809367 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| China | 96180182.4 | 12/13/96 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Cuba | | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Czech | PV2000-4692 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Euro Patent | 99957131.8 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Euro Patent | 96309177.2 | 12/16/96 | Mobile Phone with SIM Card | Pending | CardSwitch |
| France | 20009330 | 7/17/00 | Communication Method & Apparatus Improvements | Pending | VSIM |
| France | 20009329 | 7/17/00 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Germany | 29623956 | 12/16/96 | Improvements Relating to Mobile Phones | Granted | CardSwitch Utility |
| Hungary | 20012642 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Iceland | 5770 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| India | 398/Cal/2000 | 12/7/2000 | Communication Method & Apparatus Improvements | Pending | VSIM |
| India | 401/Cal/2000 | 7/13/00 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Indonesia | W-00200100120 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |

| Country | Number | Date | Title | Status | Mark |
|---|---|---|---|---|---|
| Israel | 140311 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Italy | 2000RM393 | 7/17/00 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Japan | 2000-555459 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Mexico | 12616 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| New Zealand | 509305 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Norway | 20006397 | 12/14/00 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Pakistan | 767/2000 | 8/23/00 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Pakistan | | | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| PCT | PCT/AU99/455 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| PCT | PCT/AU96/802 | 12/13/96 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Philippines | 1-200-02301 | 2/29/00 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Poland | PL 346269 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Korea | 2000-7014293 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Russia | | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Singapore | | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| South Africa | 20010311 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| South Africa | 9797 | 7/1/1997 | Improvements Relating to Mobile Phones | Granted | CardSwitch |
| Spain | P200001837 | 7/14/00 | Improvements Relating to Mobile Phones | Pending | CardSwitch |
| Taiwan | 89118878 | 9/14/00 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Turkey | | 6/15/99 | Communication Method & Apparatus Improvements | Pending | VSIM |
| Ukraine | 2001010220/M | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |
| United Kingdom | 200017365.8 | 11/6/1999 | Communication Method & Apparatus Improvements | Pending | VSIM |

ATTACHMENT B

FORM OF WARRANT

THIS WARRANT AND THE UNDERLYING SECURITIES HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE
"ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR
HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION
STATEMENT AS TO SUCH SECURITIES UNDER THE ACT OR AN OPINION OF
COUNSEL SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION
IS NOT REQUIRED.

Warrant No. _____

Number of Shares: 500,000
(subject to adjustment)

Date of Issuance: October ___, 2003

## WAY SYSTEMS, INC.

## WARRANT AGREEMENT FOR PURCHASE OF SERIES A-1 PREFERRED STOCK

### (VOID AFTER THE EXPIRATION DATE (AS DEFINED BELOW))

WAY SYSTEMS, INC., A DELAWARE CORPORATION (THE "COMPANY"),
AND FRACTAL COMMERCE, INC., A DELAWARE CORPORATION (THE
"REGISTERED HOLDER"), HEREBY AGREE THAT THE REGISTERED HOLDER
IS ENTITLED, SUBJECT TO THE TERMS AND CONDITIONS SET FORTH BELOW,
TO PURCHASE FROM THE COMPANY, AT ANY TIME OR FROM TIME TO TIME
ON OR AFTER THE DATE OF ISSUANCE AND ON OR BEFORE 5:00 P.M. (BOSTON
TIME) ON OCTOBER ___, 2003, 500,000 SHARES OF SERIES A-1 PREFERRED
STOCK, $.001 PAR VALUE PER SHARE, OF THE COMPANY ("SERIES A-1
STOCK"), AT A PURCHASE PRICE OF $.40 PER SHARE.   THE SHARES
PURCHASABLE UPON EXERCISE OF THIS WARRANT, AND THE PURCHASE
PRICE PER SHARE, EACH AS ADJUSTED FROM TIME TO TIME PURSUANT TO
THE PROVISIONS OF THIS WARRANT, ARE HEREINAFTER REFERRED TO AS
THE "WARRANT SHARES" AND THE "PURCHASE PRICE," RESPECTIVELY.

1.    Exercise.

(a)    Exercise for Cash.  The Registered Holder may, at its option, elect to
exercise this Warrant, in whole or in part and at any time or from time to time, by surrendering
this Warrant, with the purchase form appended hereto as Exhibit I duly executed by or on behalf
of the Registered Holder, at the principal office of the Company, or at such other office or
agency as the Company may designate, accompanied by payment in full, in lawful money of the
United States, of the Purchase Price payable in respect of the number of Warrant Shares
purchased upon such exercise.

(b)    Cashless Exercise.

(i)    The Registered Holder may, at its option, elect to exercise this Warrant, in whole or in part and at any time or from time to time, on a cashless basis, by surrendering this Warrant, with the purchase form appended hereto as Exhibit I duly executed by or on behalf of the Registered Holder, at the principal office of the Company, or at such other office or agency as the Company may designate, by canceling a portion of this Warrant in payment of the Purchase Price payable in respect of the number of Warrant Shares purchased upon such exercise. In the event of an exercise pursuant to this subsection 1(b), the number of Warrant Shares issued to the Registered Holder shall be determined according to the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where: X =    the number of Warrant Shares that shall be issued to the Registered Holder;

Y =    the number of Warrant Shares for which this Warrant is being exercised (which shall include both the number of Warrant Shares issued to the Registered Holder and the number of Warrant Shares subject to the portion of the Warrant being cancelled in payment of the Purchase Price);

A =    the Fair Market Value (as defined below) of one share of Series A-1 Stock (or Common Stock, in the event of conversion pursuant to Section 2(c) below); and

B =    the Purchase Price then in effect.

(ii)    The Fair Market Value per share of Series A-1 Stock shall be determined as follows:

(1)    If the Common Stock of the Company is listed on a national securities exchange, the Nasdaq National Market or another nationally recognized trading system as of the Exercise Date, the Fair Market Value per share of Series A-1 Stock shall be the average of the closing prices of the Company's Common Stock over a 20-day period ending on the trading day immediately preceding the Exercise Date.

(2)    If the Common Stock of the Company is not listed on a national securities exchange, the Nasdaq National Market or another nationally recognized trading system as of the Exercise Date, then Fair Market Value per share of Series A-1 Stock shall be the price per share of the most recent series of Preferred Stock issued by the Company preceding the Exercise Date (as defined below).

(c)    Exercise Date. Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which this Warrant shall have been surrendered to the Company as provided in subsection 1(a) or 1(b) above (the "Exercise Date"). 

(d)    Issuance of Certificates.  As soon as practicable after the exercise of this Warrant in whole or in part, and in any event within 10 days thereafter, the Company, at its expense, will cause to be issued in the name of, and delivered to, the Registered Holder, or as the Registered Holder (upon payment by the Registered Holder of any applicable transfer taxes) may direct:

(i)    a certificate or certificates for the number of full Warrant Shares to which the Registered Holder shall be entitled upon such exercise plus, in lieu of any fractional share to which the Registered Holder would otherwise be entitled, cash in an amount determined pursuant to Section 3 hereof; and

(ii)    in case such exercise is in part only, a new warrant or warrants (dated the date hereof) of like tenor, calling in the aggregate on the face or faces thereof for the number of Warrant Shares equal (without giving effect to any adjustment therein) to the number of such shares called for on the face of this Warrant minus the number of Warrant Shares for which this Warrant was so exercised (which, in the case of an exercise pursuant to subsection 1(b), shall include both the number of Warrant Shares issued to the Registered Holder pursuant to such partial exercise and the number of Warrant Shares subject to the portion of the Warrant being cancelled in payment of the Purchase Price).

(e)    Expiration Date.  This Warrant shall expire upon the earlier of (i) October ____, 2008, or (ii) immediately prior to the date of consummation of an event that would be deemed a liquidation event as defined in the liquidation preference provisions of the Series A-1 Preferred Stock as set forth in the Company's then current Certificate of Incorporation.

2.    Adjustments.

(a)    Adjustment for Stock Splits and Combinations.  If the Company shall at any time or from time to time after the date on which this Warrant was first issued (or, if this Warrant was issued upon partial exercise of, or in replacement of, another warrant of like tenor, then the date on which such original warrant was first issued) (either such date being referred to as the "Original Issue Date") effect a subdivision of the outstanding Series A-1 Stock, the Purchase Price then in effect immediately before that subdivision shall be proportionately decreased.  If the Company shall at any time or from time to time after the Original Issue Date combine the outstanding shares of Series A-1 Stock, the Purchase Price then in effect immediately before the combination shall be proportionately increased.  Any adjustment under this paragraph shall become effective at the close of business on the date the subdivision or combination becomes effective.

(b)    Adjustment in Number of Warrant Shares.  When any adjustment is required to be made in the Purchase Price pursuant to subsections 2(a), the number of Warrant Shares purchasable upon the exercise of this Warrant shall be changed to the number determined by dividing (i) an amount equal to the number of shares issuable upon the exercise of this Warrant immediately prior to such adjustment, multiplied by the Purchase Price in effect immediately prior to such adjustment, by (ii) the Purchase Price in effect immediately after such adjustment.

(c)    Adjustment for Conversion of Preferred Stock.  If all of the outstanding shares of Preferred Stock are converted into Common Stock of the Company in accordance with the terms of the Certificate of Incorporation of the Company, then, effective upon such conversion, (i) this Warrant shall be exercisable for such number of shares of Common Stock as is equal to the number of shares of Common Stock that each share of Preferred Stock was converted into, multiplied by the number of shares of Preferred Stock subject to this Warrant immediately prior to such conversion, (ii) the Purchase Price shall be the Purchase Price in effect immediately prior to such conversion divided by the number of shares of Common Stock into which each share of Preferred Stock was converted, and (iii) all references in this Warrant to "Preferred Stock" shall thereafter be deemed to refer to "Common Stock."

(d)    Adjustment for Reorganization.  If there shall occur any reorganization, recapitalization, reclassification, consolidation or merger in which the holders of capital stock of the Company immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger continue to hold at least a majority of the outstanding voting power of such surviving corporation or other entity immediately following such reorganization, recapitalization, reclassification, consolidation or merger of the Company in which the Series A-1 Stock is converted into or exchanged for securities, cash or other property (other than a transaction covered by subsections 2(a), 2(b) or 2(c)) (collectively, a "Reorganization"), then, following such Reorganization, the Registered Holder shall receive upon exercise hereof the kind and amount of securities, cash or other property which the Registered Holder would have been entitled to receive pursuant to such Reorganization if such exercise had taken place immediately prior to such Reorganization.  In any such case, appropriate adjustment (as determined in good faith by the Board) shall be made in the application of the provisions set forth herein with respect to the rights and interests thereafter of the Registered Holder, to the end that the provisions set forth in this Section 2 (including provisions with respect to changes in and other adjustments of the Purchase Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities, cash or other property thereafter deliverable upon the exercise of this Warrant.

(e)    Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Purchase Price pursuant to this Section 2, the Company at its expense shall, as promptly as reasonably practicable but in any event not later than thirty (30) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to the Registered Holder a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property for which this Warrant shall be exercisable and the Purchase Price) and showing in detail the facts upon which such adjustment or readjustment is based.  The Company shall, as promptly as reasonably practicable after the written request at any time of the Registered Holder (but in any event not later than thirty (30) days thereafter), furnish or cause to be furnished to the Registered Holder a certificate setting forth (i) the Purchase Price then in effect and (ii) the number of shares of Series A-1 Preferred Stock or other securities, cash or property which then would be received upon the exercise of this Warrant.

(f)    Adjustment upon the Occurrence of Certain Liquidation Events.  Upon the occurrence of (i) any event that would be deemed a liquidation event of the Company (whether a liquidation, merger or sale of all or substantially all of the assets of the Company) as defined in the liquidation preference provisions of the Series A-1 Preferred Stock as set forth in the Company's then current Certificate of Incorporation, and (ii) the per share consideration to be

received by holders of Series A-1 Preferred Stock as a result of such liquidation event is less than 0.80 Dollars per share (subject to equitable adjustment as provided under Section 2(a) above), then the per share exercise price of the Series A-1 Warrant will be at par value of $.001 per share.

3.    Fractional Shares.  The Company shall not be required upon the exercise of this Warrant to issue any fractional shares, but shall pay the value thereof to the Registered Holder in cash on the basis of the Fair Market Value per share of Series A-1 Preferred Stock, as determined pursuant to subsection 1(b)(ii) above.

4.    Investment Representations.    The initial Registered Holder represents and warrants to the Company as follows:

(a)    Investment.  It is acquiring the Warrant, and (if and when it exercises this Warrant) it will acquire the Warrant Shares, for its own account for investment and not with a view to, or for sale in connection with, any distribution thereof, nor with any present intention of distributing or selling the same; and the Registered Holder has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the disposition thereof.

(b)    Accredited Investor.  The Registered Holder is an "accredited investor" as defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Act").

(c)    Experience.  The Registered Holder has made such inquiry concerning the Company and its business and personnel as it has deemed appropriate; and the Registered Holder has sufficient knowledge and experience in finance and business that it is capable of evaluating the risks and merits of its investment in the Company.

5.    Transfers.

(a)    This Warrant shall not be transferable or assignable in any manner, except to affiliates of the Registered Holder, and no interest shall be pledged or otherwise encumbered by the Registered Holder without the express written consent of the Company, and any such attempted disposition of this Warrant or any portion hereof shall be of no force or effect. Any permitted transferee shall sign an investment letter in form and substance satisfactory to the Company as a condition to any permitted transfer. This Warrant and the Warrant Shares shall not be sold or transferred unless either (i) they first shall have been registered under the Act, or (ii) the Company first shall have been furnished with an opinion of legal counsel, reasonably satisfactory to the Company, to the effect that such sale or transfer is exempt from the registration requirements of the Act.

(b)    Each certificate representing Warrant Shares shall bear a legend substantially in the following form:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be offered, sold or otherwise transferred, pledged or hypothecated unless and until such securities are registered under such Act or an opinion of 

counsel satisfactory to the Company is obtained to the effect that such registration is not required."

"The shares represented by this certificate are subject to certain restrictions on sale, transfer as set forth in a certain Warrant Agreement held by the issuer and/or its assignees as set forth in such Warrant Agreement, a copy of which may be obtained at the principal office of the issuer. Such sale and transfer restrictions are binding on transferees of these shares."

The foregoing legend shall be removed from the certificates representing any Warrant Shares, at the request of the holder thereof, at such time as they become eligible for resale pursuant to Rule 144(k) under the Act.

(e)    The Company will maintain a register containing the name and address of the Registered Holder of this Warrant. The Registered Holder may change its address as shown on the warrant register by written notice to the Company requesting such change.

6.    Reservation of Stock. The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, such number of Warrant Shares and other securities, cash and/or property, as from time to time shall be issuable upon the exercise of this Warrant.

7.    Exchange or Replacement of Warrants.

(a)    Upon the surrender by the Registered Holder, properly endorsed, to the Company at the principal office of the Company, the Company will, subject to the provisions of Section 5 hereof, issue and deliver to or upon the order of the Registered Holder, at the Company's expense, a new Warrant or Warrants of like tenor, in the name of the Registered Holder or as the Registered Holder (upon payment by the Registered Holder of any applicable transfer taxes) may direct, calling in the aggregate on the face or faces thereof for the number of shares of Series A-1 Preferred Stock (or other securities, cash and/or property) then issuable upon exercise of this Warrant.

(b)    Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement (with surety if reasonably required) in an amount reasonably satisfactory to the Company, or (in the case of mutilation) upon surrender and cancellation of this Warrant, the Company will issue, in lieu thereof, a new Warrant of like tenor.

8.    Agreement in Connection with Public Offering. The Registered Holder agrees, in connection with the initial underwritten public offering of the Company's securities pursuant to a registration statement under the Act, (i) not to sell, make short sale of, loan, grant any options for the purchase of, or otherwise dispose of any shares of Series A-1 Preferred Stock (including any Common Stock issuable upon the conversion of such Series A-1 Preferred Stock) held by the Registered Holder (other than any shares included in the offering) without the prior written consent of the Company or the underwriters managing such initial underwritten public offering of the Company's securities for a period of 180 days from the effective date of such registration·

statement, and (ii) to execute any agreement reflecting clause (i) above as may be requested by the Company or the managing underwriters at the time of such offering.

9    Notices.    All notices and other communications from the Company to the Registered Holder in connection herewith shall be mailed by certified or registered mail, postage prepaid, or sent via a reputable nationwide overnight courier service guaranteeing next business day delivery, to the address last furnished to the Company in writing by the Registered Holder. All notices and other communications from the Registered Holder to the Company in connection herewith shall be mailed by certified or registered mail, postage prepaid, or sent via a reputable nationwide overnight courier service guaranteeing next business day delivery, to the Company at its principal office set forth below. If the Company should at any time change the location of its principal office to a place other than as set forth below, it shall give prompt written notice to the Registered Holder and thereafter all references in this Warrant to the location of its principal office at the particular time shall be as so specified in such notice. All such notices and communications shall be deemed delivered (i) two business days after being sent by certified or registered mail, return receipt requested, postage prepaid, or (ii) one business day after being sent via a reputable nationwide overnight courier service guaranteeing next business day delivery.

10.    No Rights as Stockholder.    Until the exercise of this Warrant, the Registered Holder shall not have or exercise any rights by virtue hereof as a stockholder of the Company.

11.    Amendment or Waiver.    Any term of this Warrant may be amended or waived only by an instrument in writing signed by the party against which enforcement of the change or waiver is sought. No waivers of any term, condition or provision of this Warrant, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

12.    Section Headings.    The section headings in this Warrant are for the convenience of the parties and in no way alter, modify, amend, limit or restrict the contractual obligations of the parties.

13.    Governing Law.    This Warrant will be governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts, without reference to the conflicts of law provisions thereof.

14.    Facsimile Signatures. This Warrant may be executed by facsimile signature.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Warrant as of the Date of Issuance first set forth above.

**WAY SYSTEMS INC.**

By:_____
Name:  Will Graylin
Title:   CEO

**FRACTAL COMMERCE INC.**

By:_____
Name: Keith Benson
Title:   President

*46.*

EXHIBIT I

## PURCHASE FORM

To:_____                                    Dated:_____

The undersigned, pursuant to the provisions set forth in the attached Warrant for Purchase of Series A-1 Preferred Stock dated [September] __, 2003 (the "Warrant") issued by Way Systems, Inc. to the undersigned, hereby elects to purchase *(check applicable box)*:

[ ] _____ shares of the Series A-1 Preferred Stock (or of such other securities that the Series A-1 Preferred Stock may have converted into pursuant to Section 2(c) or 2(d) of the Warrant) pursuant to the cash payment set forth under the terms of the Warrant; or

[ ] the maximum number of shares of Series A-1 Preferred Stock (or of such other securities that the Series A-1 Preferred Stock may have converted into pursuant to Section 2(c) or 2(d) of the Warrant) covered by such Warrant pursuant to the cashless exercise procedure set forth in subsection 1(b).

The undersigned herewith makes payment of the full purchase price for such shares at the price per share provided for in such Warrant. Such payment takes the form of *(check applicable box or boxes)*:

[ ] $_____ in lawful money of the United States; and/or

[ ] the cancellation of such number of Warrant Shares as is necessary, in accordance with the

formula set forth in subsection 1(b), to exercise this Warrant with respect to the maximum

number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in

subsection 1(b).

Signature: _____
Address: _____
         _____

## ATTACHMENT C

## CONFIDENTIALITY AGREEMENT

TO: _____ ("_____")

I,_____ of _____
COVENANT IN FAVOR OF                    THAT:

1.    In performing my duties, I may become acquainted with or have access to confidential information of _____ and its respective customers (hereinafter "Confidential Information").

2.    Confidential Information includes any information of _____ which is regarded by it as confidential, including information relating to technology, processes, products, specifications, inventions or designs used or developed by _____, trade secrets and know-how, financial information and other information of a commercially sensitive nature which has not come into the public domain otherwise than by disclosure in breach of this deed.

3.    I shall keep the Confidential Information secret and confidential.

4.    I shall not disclose any part of the Confidential Information to any person other than Fractal Commerce, Inc. and in those cases, only to the extent required to fulfill my audit duties referred to in clause 5 below.

5.    I shall not use the confidential information for any purposes other than for the purpose of an audit under the license agreement dated October __, 2003 between Fractal Commerce Inc. and Way Systems Inc. (the "License Agreement").

6.    I shall not appropriate, copy, memorize or in any other manner reproduce or reverse engineer any of the Confidential Information other than for the purpose of an audit under the License Agreement.

7.    I shall indemnify, and hold harmless Fractal Commerce Inc. against all costs, liability, losses and claims as determined by a court of law incurred in connection with any proven breach of this undertaking.

9.    Without limiting any other rights of Fractal Commerce Inc., I agree that Fractal Commerce Inc. will be entitled to injunctive relief to restrain any breach or threatened breach of this undertaking.

10.    My obligations hereunder continue with respect to any part of the Confidential Information until that part passes into the public domain, other than directly or indirectly

42

*18.*

as a result of or in connection with any breach by me of the confidentiality obligations as set forth in this deed.

11.    This agreement shall be governed by the laws of the Commonwealth of Virginia and I submit to the non-exclusive jurisdiction of courts in that place.

**AGREED AND EXECUTED ON** _____

_____

**SIGNED** in the presence of:-                    )

_____    Witness

_____    Address

_____

_____    Occupation

43

## ATTACHMENT D

## LICENSOR'S TECHNICAL INFORMATION

1.    **Architecture on Intellectual Property and Systems**

These documents provide technical description at a high level and then at progressively lower levels on the V-SIM Device Hardware Interfaces and Software Layers and its concept of operations and the required inputs, outputs and memory, including all firmware, software, and related information illustrated on Attachment C.

2.    **V-SIM Smartcard Acceptance Criteria**

These documents provide the overview and detail required for the V-SIM Smart Card, ePurse and File System to work and interoperate on the V-SIM Device.

3.    **V-SIM Enabled Wireless Terminal Platform Acceptance Criteria**

These documents provide the overview and detail required for the V-SIM Device to be tested and verified as working and interoperating with the V-SIM Applications and V-SIM Security Framework. Incorporates Useability Testing.

4.    **V-SIM Engineering Acceptance Performance Test Criteria**

These documents provide the overview and detail required for the V-SIM Device to be tested and verified to an operational performance level with Hardware and Engineering Parameters, ETSI and ISO Smart Card Standards.

5.    **Support Bulletin**

Necessary Updates on Internationalisation and Safety Concerns, New Requirements, Testing Routines, Security Patches and Training Updates. Required Updates for Useability.

**ATTACHMENT E**

## GLOBAL PERFORMANCE CRITERIA

In accordance with Section 2.1(c), in order to maintain rights of exclusivity under this Agreement, the Licensee shall attain the following aggregate minimum Sales of MPOS Devices for the Territory during each of the following Accounting Periods, and shall pay the corresponding Royalties to the Licensor thereon; provided, however, that calculation of such aggregate minimum Sales of MPOS Devices shall not include MPOS Devices sold to the Licensor under the MPOS Reseller Agreement at the price paid as determined by Section 2.2(c)(ii); provided, further, that calculation of such aggregate minimum Sales of MPOS Devices shall include MPOS Devices sold to the Licensor under the MPOS Reseller Agreement at the prices paid by Section 2.2(c)(i):

| Accounting Period | Global Minimum Sales of MPOS Devices |
|---|---|
| 2004 | 20,000 |
| 2005 | 40,000 |
| 2006 and each Accounting Period thereafter in which Sales are made | 60,000 |

The Licensee shall have the right and option to maintain rights of exclusivity under this Agreement by prepaying Royalties applicable to the minimum number of MPOS Devices required to be sold in a given Accounting Period. Royalties prepaid by Licensee hereunder and not accrued against Sales in the year for which such Royalties were prepaid shall be applied against Sales in subsequent Accounting Periods; provided, however, to the extent such Sales are covered by prepaid Royalties, such Sales shall not be counted in connection with determining whether Licensee has achieved the Global Minimum Sales requirement for any subsequent Accounting Period; provided, further, Licensee shall be permitted during any Accounting Period to prepay Royalties up to the Regional Performance Criteria and Global Performance Criteria applicable to such Accounting Period.

## REGIONAL PERFORMANCE CRITERIA

In accordance with Section 2.1(d), for the Accounting Period commencing January 1, 2004 and each Accounting Period thereafter, the Licensee must Sell into each Region a minimum number of MPOS Devices not less than ten (10) percent of the aggregate minimum Sales of MPOS Devices for the applicable Accounting Period as specified by the Global Performance Criteria ("Regional Minimum Sales"). Should the Licensee fail to meet the applicable Regional Minimum Sales in a given Region for two (2) consecutive calendar years, the Licensee's exclusivity rights under this Agreement with respect to such Region shall expire and a non-exclusive license with respect to such Region shall be granted in accordance with Section 2.1(d).

45

## ATTACHMENT F

## <u>DEMONSTRATION KIT</u>

WAY SYSTEMS Demonstration Kit   FREE OF CHARGE (Expected available by September 2003)

- 1 Mobile Phone, MTT with Smart Card and Magnetic Stripe readers
- 1 Mobile Printer
- 1 SAM
- Debit/Credit demonstration applications
- Documentation
- Training

46

# ATTACHMENT G

## SCHEDULE OF EXCEPTIONS

### Section 4.1 (a) - (d)

KeyCorp license to V-SIM technology as described in License Agreement.

### Section 4.1 (a), (b), (d), (e), (f), (h)

Claims made by Imbros Corporation/Funge Merger Corporation and related individuals and entities, including any successors, assigns, and purchasers, arising out of or in connection with the chapter 11 proceeding of Funge Systems, Inc. in the U.S. Bankruptcy Court for the Eastern District of Virginia, asserting rights to Licensor's Technology or Licensor's Intellectual Property Rights.

47

 RANKINES

**ATTACHMENT II**

*olicitors*

Practising in Taxation and Commercial Law

*ampbell Stuart Rankine*

M.Tax (U.N.S.W.)
LL.M. (Commercial)  LL.B. (Hons.)
B.A. (Accountancy)  C.A.  C.P.A.

*avid John Tucker*

LL.B.

*eremy Vyvyan Rees*

LL.B.  B.Ec.

ABN 72 917 682 639

190 Flinders Street
**ADELAIDE**
South Australia 5000

G.P.O. Box 1666
**ADELAIDE**
South Australia 5001

Telephone:        (08) 8223 5055
Facsimile:        (08) 8232 6252

Our Ref:  DJT:xp:890.1:Newcom Advice (Patents)

20 October 2003

Mr K. Benson
Fractal Commerce Inc.
1931 Crescent Park Drive,
RESTON, VIRGINIA 20190, U.S.A.

Dear Keith,                                                             **BY E-MAIL**

Re:   Exclusive License Agreement – Way Systems Inc.

I refer to your e-mail received on 17th October 2003, attaching a draft of the proposed License Agreement to be made between Fractal Commerce Inc. ("Fractal") as licensor and Way Systems Inc. ("Way") as licensee.

In particular I note that the draft License Agreement provides for the grant of exclusive rights to Way with respect to described applications of the technology and rights granted to Fractal by Aussie LLC Pty. Ltd. ("Aussie").

Aussie hereby agrees to the license to Way, through Fractal, of all of the rights as set out in the proposed Licence Agreement, and Aussie will not to grant to any other person or entity any rights, entitlements or privileges which could detract from the rights to be granted to Way under the License Agreement.  This Letter Agreement shall be sufficient to authorize and transfer all such rights from Aussie as necessary to effectuate the License Agreement.

I note that this agreement is made on the basis of the matters agreed between you, on behalf of Fractal, and me, on behalf of Aussie, in our discussions concerning the License Agreement and

48

as finalised today, which constitute good and valuable consideration for the obligations of Aussie under this Letter Agreement. The consent and agreement contained in this letter may be relied on by Way without any reservation as between Aussie and Way concerning these matters.

Agreed to and Accepted by Aussie and its sole director.

**JOHN TUCKER**
john@rankines.com.au